HUGHES–GIBB & CO., LTD., Underwriters of Lloyds of London as Subrogee of Ag-World Export, Inc., Plaintiff,

v.

The FLYING TIGER LINE, INC., Defendant.

No. 80 C 3476.

United States District Court, N. D. Illinois, E. D.

Jan. 12, 1981.

Karen Mellow, Conklin & Adler, Ltd., Chicago, Ill., for plaintiff.

C. Kevin McCabe, Lord, Bissell & Brook, Chicago, Ill., for defendant.

## ORDER

BUA, District Judge.

This cause comes before the court on the motion of the defendant herein, the Flying Tiger Line, Inc., for summary judgment.[1] Rule 56(b), Fed.R.Civ.P. As in the matter at bar the defendant's potential liability is predicated upon an interpretation of the Warsaw Convention, 49 U.S.C. § 1502 note, and the amount in controversy exceeds $10,-000, exclusive of interest and costs, subject matter jurisdiction over the cause properly lies pursuant to 28 U.S.C. § 1331(a).

### Facts

In the matter at bar, the plaintiff, Hughes-Gibb & Co., Ltd., seeks to recover, in its capacity as subrogee, for the loss of 72 breeding swine (out of a shipment of 130) sustained by its subrogor-insured, Ag-World Export, Inc. This loss, Hughes-Gibb contends, was due to and resulted from the defendant's alleged mishandling of the subject swine while they were being transported by Flying Tiger from Chicago, Illinois to Manila, Philippines.

In the summer of 1978, the 130 breeding swine forming the basis of this litigation were located in Bloomington, Illinois. During that summer, Ag-World Exports (the Shipper), the owner of the swine, contracted to have them sold to South Cotabato Hog Raisers, Inc. (the Consignee), a Philippine hog merchant. In conjunction with this sale, the Shipper also contracted with the defendant (the Carrier) to have the 130 pigs transported from the United States to the Philippines.

Although their ultimate destination was Davao City, Philippines, it appears that un-

---

1. The motion under discussion was presented as one for dismissal, for failure to state a claim upon which relief could be granted. Because complete resolution of it required that consideration be given to materials outside of the pleadings, however, it has been treated by the court as one for summary judgment. Rule 12(b)(6), Fed.R.Civ.P.

der the terms of the Ag-World—Flying Tiger Line contract of carriage, as embodied in Airway Bill 023–19658796, the defendant was obligated to carry the pigs only from Chicago to Manila, Philippines. Carriage from Manila to Davao City was to be by Philippine Aerotransport, apparently pursuant to a separate transportation agreement. *See* Defendant's Exhibit B–1.[2]

The 130 breeding swine debarked Chicago for the Philippines on July 12, 1978, aboard an airliner owned and operated by the defendant. Upon their arrival in Manila on July 14, it was discovered that 60 of the pigs had died, allegedly as a result of suffocation during the flight. These 60 pigs were certified as dead on arrival by a Philippines' Customs Examiner, a representative of the Philippines Bureau of Animal Industry, and by a representative of the defendant. Plaintiff's Exhibit A. According to the plaintiff, the dead animals were then rendered, without autopsy, to the National Slaughterhouse of the Bureau of Animal Industry.

At the Manila airport, the 70 surviving boars and gilts were transferred, by the Shipper's agent, to a Philippine Aerotransport aircraft, and flown the same day [July 14] to Davao City. Defendant's Exhibit B–3. According to the plaintiff, 3 more pigs died during that flight. That having occurred, when the 67 surviving swine were off-loaded in Davao City, they were immediately placed in the custody of the Bureau of Animal Industry, and were quarantined for a period of 30 days. 9 more pigs are

alleged to have died during this quarantine period. At the expiration of the quarantine, the remaining 58 pigs were released to the Consignee.

On August 28, 1978, the Consignee presented a claim to the defendant for the loss of the original 60 head of breeding swine. Defendant's Exhibit A. Written notice of South Cotabato's claim for the loss of the other 12 pigs was provided to Flying Tiger sometime in January of 1979. Defendant's Exhibit A.

### Applicable Law

In its motion for summary judgment, Flying Tiger contends first that any claims against it in this matter will be governed solely by the provisions of Article 26 of the Warsaw Convention; and secondly that, since the plaintiff's subrogor did not give Flying Tiger written notice of its loss within seven days of July 14, 1978, the date of the loss, as is required by Article 26(2), Hughes-Gibb is precluded from recovering against it [the Carrier].[3]

Article 26(2) of the Warsaw Convention provides that:

> [i]n case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and at the latest, within 3 days from the date of receipt in the case of baggage and 7 days from the date of receipt in the case of goods. . . .

As regards Article 26(2), the plaintiff contends that the 7 day notice requirement for goods applies only in cases of "damaged" goods. The 72 dead pigs forming the basis

---

**2.** Sometime before the Flying Tiger flight's departure on July 12, 1978, an agent of the Shipper telexed instructions to the Consignee that it was "to meet Tiger aircraft [and] take deliver (sic) of the 5 containers [containing the subject pigs] and go to Davao." Defendant's Exhibit B–2.

**3.** Article 26 provides:

(1) Receipt by the person entitled to the delivery of baggage or goods without complaint shall be *prima facie* evidence that the same have been delivered in good condition and in accordance with the document of transportation.

(2) In case of damage, the person entitled to delivery must complain to the carrier

forthwith after the discovery of the damage, and at the latest, within 3 days from the date of receipt in the case of baggage and 7 days from the date of receipt in the case of goods. In case of delay the complaint must be made at the latest within 14 days from the date on which the baggage or goods have been placed at his disposal.

(3) Every complaint must be made in writing upon the document of transportation or by separate notice in writing dispatched within the times aforesaid.

(4) Failing complaint within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on his part.

of its claim, the plaintiff argues, were not "damaged" goods, but rather were "destroyed" goods, to which Article 26 has no applicability.

As to this argument of the plaintiff, the court believes *Dalton v. Delta Airlines, Inc.,* 570 F.2d 1244 (5th Cir. 1978) to be dispositive. *Dalton* appears to be the only federal decision dealing with the death of animals during a Warsaw Convention-controlled flight. In that action, the unlucky animals were a shipment of 5 greyhounds who had died while in carriage from Ireland to Miami, Florida. The district court had granted the defendant's motion for summary judgment, based upon the plaintiff's admitted failure to provide Delta with notice of his claim within seven days of the date of delivery. The Fifth Circuit, however, reversed, holding instead that "where destruction of goods occurs on an international flight the shipper-consignee need not give [Article 26(2) and (3)] notice." *Id.* at 1248.

In *Dalton,* the Fifth Circuit found a "gap" in Article 26, which it entitled "The Lost Chord in the Warsaw Concerto." By its own terms, the Fifth Circuit stated in this regard, "[Article 26] is applicable only in cases of damage or delay. Our unfortunate greyhounds were neither damaged nor delayed; they were destroyed." *Id.* at 1246.

This court agrees with the *Dalton* court's conclusion that, due to an apparent drafting oversight, a loophole exists in the Warsaw Convention. This loophole comes into view when three of the Convention's sub-sections are examined: Article 18(1) provides that a carrier shall be liable for damages sustained in three separate factual situations—those relating to lost, destroyed and damaged goods.[4] Regarding lost goods, Article 13(3) indicates that notice need not be given;[5] as to damaged goods, Article 26(2), as was

noted previously, requires timely notice; concerning destroyed goods, the Convention is silent as to notice.

■ This court also agrees with the position taken by the Fifth Circuit in regard to this Warsaw Convention loophole: that no notice need be given to the carrier for claims involving destroyed goods. The *Dalton* court reached this conclusion by applying sound and accepted rules of contract construction. Faced with a factual situation not expressly provided for in the Warsaw Convention, the *Dalton* court turned to and examined that fact situation covered by the Convention which was most similar to the one before it, i. e. the one relating to lost goods, and determined that the two situations should be treated alike. In making this determination, the court noted that a factor clearly common to both lost and destroyed goods, but hardly ever to damaged goods, was that "in [the case of lost or destroyed goods, the goods] are wholly without economic value or utility to the shipper-consignee beyond mere scrap value." *Id.* at 1246–47.

A careful reading of the debates of the Warsaw Convention provides another basis for approving the *Dalton* holding. *Minutes of the Second International Conference of Private Aeronautical Law,* Oct. 4–12, 1929, Warsaw, translated R. C. Horner and D. Legrez. The *Minutes* of the Fifth Session reveal that the Article 26 notice provision was developed primarily for application in cases involving disputes over the value of delivered goods. That being true, in light of the fact that dead animals seldom—if ever—have a value subject to dispute, to conclude as the *Dalton* court did, that the strictures of Article 26 should have no bearing in this type of factual situation, seems eminently sound.

■ The defendant, however, also argues that, even if this court accepts the *Dalton*

4. Article 18(1) provides:

The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.

5. Article 13(3) provides:

If the carrier admits the loss of the goods, or if the goods have not arrived at the expiration of seven days after the date on which they ought to have arrived, the consignee shall be entitled to put into force against the carrier the rights which flow from the contract of transportation.

interpretation of the Warsaw Convention, the instant case is distinguishable. In this regard, Flying Tiger contends that the Consignee of the subrogor-insured of the plaintiff herein, in contrast to what was done in *Dalton*, while he was at the Manila airport acknowledged receipt of the entire shipment of the subject animals. Assuming such to be true, though, the court does not see how this fact alone could warrant a result different from that in *Dalton*, at least with respect to the 60 pigs that died on the Chicago to Manila flight.

Although South Cotabato's agent may have acknowledged receipt of the same (which itself has not been established conclusively), the fact remains that those 60 animals never were in the Consignee's possession or control. As was true with the dogs in *Dalton*, upon their arrival in Manila these 60 pigs were removed immediately from the airport, in this case for rendering to a slaughterhouse. Flying Tiger, moreover, like Delta—the *Dalton* carrier, recognized that these animals were dead on arrival. The defendant, in fact, along with two officials of the Philippines' government, signed a certificate to that effect at the Manila airport. That being so, as the fact of this loss was obvious and apparent to the defendant, to require that written notice also be provided of it before any recovery could be had would seem to serve no useful or justifiable purpose. *Dalton*, 570 F.2d at 1247.

The defendant also contends that the plaintiff's breeding pigs, in contrast to the *Dalton* dogs, must be considered damaged— rather than destroyed—goods because, even when dead, they [the pigs] had economic value.[6] Flying Tiger argues in this regard that, unlike dead greyhounds, dead pigs have value because they are edible. The economic value test for destroyed goods, however, as the *Dalton* court clearly noted, is whether the goods remain useable for the

owner's purpose. In this regard, just as dead greyhounds cannot race, dead breeding swine cannot breed. Even for the purposes of Messrs. Swift and Armour, though, pigs that die on airplanes are without economic value. This is so because sausage made from pigs not killed in slaughterhouses is adulterated sausage under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 342(a)(5).

As to the 60 pigs that arrived dead in Manila, then, this court adopts the "no notice for destroyed goods" rule of *Dalton*. That being so, the defendant's motion for summary judgment will be denied as to these animals.

▇ Flying Tiger's motion for summary judgment as to the 12 pigs that died either on board the Philippines Aerotransport flight to Davao City or during the month-long quarantine that followed said flight will, for different reasons, also be denied. This will be done because the court cannot, at the present time, accept as conclusive Defendant's Exhibit B–1 (Airway Bill 023–19658796), which was introduced in part to establish that Flying Tiger was obligated to deliver the entire shipment of 130 pigs only to Manila.[7] The court, though, also believes that, should the facts later establish that the parties intended Manila, and not Davao City, to be the ultimate destination of the Ag-World—Flying Tiger Line contract of carriage, summary judgment in favor of the defendant would be appropriate as to the plaintiff's claims for those 12 pigs.

These pigs survived the Flying Tiger flight to Manila. Upon their arrival at the Manila airport, they were off-loaded from the defendant's plane, by the Shipper, and placed aboard another carrier's aircraft for shipment to Davao City. Defendant's Exhibit B–3. From the defendant's perspective, therefore, these 12 animals, along with the other survivors, would have been con-

---

6. In denying this aspect of Flying Tiger's motion for summary judgment, the court has not made a finding of fact regarding this "remaining economic value" issue raised by the defendant. Accordingly, Flying Tiger will not be precluded by the court's ruling in the motion at bar from litigating this question at trial.

7. The plaintiff contends that the defendant was obligated to deliver the full shipment of 130 pigs to Davao City, not just to Manila. Flying Tiger disputes this contention, claiming instead that, under the provisions of the Ag-World— Flying Tiger Line contract of carriage, its obligations ended at Manila.

sidered live pigs, on their way to their final destination.

 The plaintiff argues that these pigs, when they arrived in Manila, had "hidden damage". Article 26 of the Warsaw Convention, however, was designed and intended to apply to cases of this type, where "hidden damage" has been alleged. *See Minutes* of the Fifth Session of the Warsaw Convention, *supra.* That being true, the court believes that, as concerns these 12 pigs, if Flying Tiger's responsibility for them ended in Manila, before recovery could be had by it from that carrier Hughes-Gibb would have to show that its subrogor had satisfied the 7 day notice requirement of Article 26.[8]

### CONCLUSION

For the reasons stated above, the motion for summary judgment of defendant Flying Tiger Line, Rule 56(b), Fed.R.Civ.P., is DENIED.

---

**8.** If, as it presently appears, the subrogor's Consignee did not provide the requisite written notice until some six months after the July 14, 1978 delivery in Manila, *see* Defendant's Exhib-it A, Hughes-Gibb's claims as to these 12 pigs likely will be barred, as a matter of law, by Article 26(3) of the Warsaw Convention.