**M.E. DENBY, individually and on behalf of certain other concerned Underwriters at Lloyds, Plaintiff,**

**v.**

**SEABOARD WORLD AIRLINES, INC. and Flying Tiger Lines, Inc., Defendants.**

No. CV–82–0593.

United States District Court, E.D. New York.

Dec. 8, 1983.

Lord, Day & Lord by Leonard S. Leaman, New York City, for plaintiff.

Bigham Englar Jones & Houston by Francis A. Montbach, New York City, for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

Plaintiff, representing a group of insurance underwriters, seeks contract damages of $673,190.16, the market value of silver shipped in a container by its subrogor, Kodak Limited, aboard a Seaboard World Airlines, Inc. flight from England to John F. Kennedy International Airport. The silver was stolen from Seaboard's warehouse at Kennedy where it had been stored, along with other Kodak property in the container.

Defendant Seaboard has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The carrier contends that the underwriters are barred from recovery because Kodak failed to file a timely, written notice of claim as required by Article 26 of the Warsaw Convention. The provisions of the Convention govern the airline's liability for goods lost or damaged during international flight.

The underwriters make two main arguments in opposition to Seaboard's motion. First, they contend that Article 26 can be applied only to claims for goods "damaged," in the sense that they were physically injured during shipment, and not to those for lost or stolen goods. Since the Convention contains no notice of claim provision governing lost goods, the underwriters maintain that their ability to recover

for the stolen silver is not affected by the Convention's time-of-claim provisions, but is governed instead by the Air Freight Rules Tariff filed by Seaboard with the Civil Aeronautics Board. Second, they maintain that even if the stolen shipment was subject to the Convention's notice of claim provision, Seaboard is barred from asserting that provision because it took possession of the Kodak container without receiving an air waybill, in violation of Article 9 of the Convention.

For reasons indicated below, Seaboard's motion for summary judgment is granted and the underwriters' complaint dismissed.

## I. FACTS

On July 10, 1980, Kodak Limited, an English company, arranged with Seaboard's Customer Service Department to ship a container of cargo to John F. Kennedy International Airport. The two companies had worked together on previous shipments. It is undisputed that Seaboard knew the shipment consisted of a single container, containing forty units, weighing a total of some 11,000 pounds. It is less clear whether Seaboard was aware that in the container were thirty-six kegs of silver residue and flake.

On July 11, a driver employed by Seaboard delivered one of Seaboard's standard ten-foot fiberglass containers to Kodak's plant outside of London. A Kodak employee loaded forty items into the container, closed the doors, and affixed a seal. The driver signed a receipt for the goods and delivered the container to Seaboard's warehouse at Heathrow Airport without incident.

On July 14, 1980, a Kodak employee delivered an air waybill to Seaboard's Heathrow office. An air waybill is a contract of carriage: it identifies the nature and weight of the cargo to be shipped; the number and any special characteristics of the packages in the shipment; the consignor and consignee; and the place of departure and destination. At the shipper's discretion, it may also include a special declaration of the cargo's value.

Kodak's air waybill described a shipment of one container, "said to contain 40 packages" of scrap paper and silver residue. It included no declaration of value and did not indicate that the container was sealed.

Why Kodak delivered the waybill three days after Seaboard took delivery is unexplained. The delayed delivery procedure was initiated by Kodak and was at variance with the procedure customarily used by the parties. In previous transactions, Seaboard prepared the waybill and delivered the bill and cargo container to Kodak at the same time. A Kodak employee would then sign the bill, retain a fully executed copy indicating Seaboard's acceptance of the cargo and return a fully executed copy to the trucker for Seaboard's records. In the case before us, however, Seaboard did not execute the bill until three days after it accepted Kodak's cargo. Technically, then, Seaboard accepted Kodak's cargo before making an effective contract of carriage.

On July 16, the Kodak container was loaded aboard Seaboard flight number 305, which took off on the same day. Seaboard stamped the waybill to certify that the container had been shipped and mailed a copy to Kodak.

The container arrived at Kennedy at 12:25 A.M. on July 17. It was stored by Seaboard employees in the cargo warehouse until the following day when Edward Kochersberger, a driver for Rochester Air Freight, arrived at the airport to claim its contents. Kochersberger, who was to transport the cargo to the Eastman Kodak Company in Rochester, New York, had been instructed to pick up forty items. The container, its seal broken and doors ajar, contained only four.

Kochersberger sought out Seaboard's cargo supervisor, Joseph Martinez, to report the missing cargo. Martinez acknowledged that thirty-six items were missing, but declined to make a notation to that effect on the Pick-Up Order and Tally Form, a document of transportation comparable to the waybill. Although Kochersberger signed the Tally Form, acknowledg-

ing "receipt of the shipment in good order and condition," he noted "4" on the Rochester Air Freight Delivery Receipt. A customs official made a similar notation on the Customs Declaration.

Neither Martinez, nor any of the three Seaboard rampmen who brought the container from the warehouse, filed a missing cargo report with Seaboard. Martinez and a Rochester Air Freight driver were subsequently tried in this Court and convicted for theft of the silver.

On August 15, Kodak called Seaboard to inform the airline that the silver had not arrived in Rochester. Scotland Yard and Seaboard began investigations. Seaboard confirmed that the Kodak cargo had been picked up by Rochester Air Freight on July 18 and asked Kodak to verify that the silver kegs were sent on the July 14 air waybill rather than in a later shipment.

The Eastman Kodak Company gave written notice of claim to Seaboard's New York office on August 26 and by letter of August 29, Kodak Limited notified Seaboard's London office concerning the silver's market value. Pursuant to a slip policy issued in 1979, the underwriters reimbursed Kodak Limited for the full market value of the silver and became subrogated to Kodak's rights against Seaboard. The underwriters filed a notice of claim with Seaboard on October 2, 1980, and commenced this action against Seaboard and its successor, Flying Tiger Lines, Inc. in March, 1983.

## II. LAW

### A. *Introduction*

■ The Warsaw Convention, a Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000–3026, TS No. 876, 137 L.N.T.S. 11, *reprinted at* 49 U.S.C. § 1502, was adopted in 1929. The United States became an adhering nation in 1934. 78 Cong.Rec. 11582; 49 Stat. 3013. The Convention requires a shipper to notify a carrier within seven days when goods are damaged. Treaty Article 26(3). It imposes no notice requirement on a shipper whose goods are lost or partially lost.

In the context of the modern air freight business, shortages in the contents of a cargo container must be characterized as "damage" within the meaning of Article 26 of the Convention, rather than loss. Accordingly, a shipper who experiences shortages from a container, such as the shortage experienced by Kodak, must file a notice of claim with the carrier within seven days of receiving the container.

The Warsaw Convention was drafted in the airline industry's infancy. Containerization, which entails loading separately packaged goods and loose objects into one large reusable metal or fiberglass package, represents a technique probably unknown to the Convention's drafters. Neither the signatories, nor later adherents like the United States, could anticipate the volume of cargo now handled by the industry, the technology which would develop to handle it efficiently, or the emergence of a lucrative, illicit industry in stolen cargo.

The realities of the modern industry dictate development of a policy which gives the airlines the earliest possible notice of pilferage from an intact cargo container. The Convention's seven-day notice provision is designed to afford the airlines, as the parties in the best position to prevent cargo theft, an opportunity to undertake the kind of prompt investigation that increases the likelihood of locating stolen goods, identifying the responsible individuals, and averting future incidents. Without prompt notice, law enforcement officials (such as the F.B.I. or city police) located at an installation like Kennedy Airport are helpless to apprehend the gangs that prey on international trade. Protection of the public, as well as the airlines and shippers, is at stake.

It is undisputed that the Convention applies to the facts of the case. The Seaboard flight meets the Article 1(2) definition of international transportation in that both the place of departure and that of destination are located within the territories of adhering parties. Although the par-

ties disagree about some minor factual issues, there is no dispute as to the material facts. Summary judgment is appropriate.

The central issue is whether under the terms of the Convention the underwriters can recover all, or at least part of the $673,000 paid to Kodak for the stolen silver, or whether as Seaboard contends, they are barred from any recovery for failing to give Seaboard timely written notice of their claim. Resolution of this issue turns on whether a shortage from a containerized shipment constitutes "loss" or "damage" as the terms are used in the Convention.

### B. Article 26: Notice of Claim

Seaboard's motion for summary judgment is based on Kodak's failure to provide written notice of claim until August 26, 1980, more than five weeks after receipt of the container and well after the filing deadlines set out in Article 26 of the Convention.

Article 26 specifies the notice of claim requirements for baggage or goods damaged or delayed in international flight. It provides the following timetable:

> (2) In case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and, at the latest, within 3 days from the date of receipt in the case of baggage and 7 days from the date of receipt in the case of goods. In case of delay the complaint must be made at the latest within 14 days from the date on which the baggage or goods have been placed at his disposal.

Treaty Article 26(2). The complaint must be in writing.

> (3) Every complaint must be made in writing upon the document of transportation or by separate notice in writing dispatched within the times aforesaid.

*Id.* Article 26(3). Except in cases of fraud on the carrier's part, failure to comply bars a claim.

> (4) Failing complaint within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on his part.

*Id.* Article 26(4).

Article 26 contains no notice requirement for lost or destroyed goods and baggage. Since the drafters were aware of such eventualities, *see* Articles 13 (referring to lost goods) and 18 (referring to destroyed, lost and damaged goods), the courts have generally held that the drafters' omission was intentional. *See, e.g., Dalton v. Delta Airlines, Inc.,* 570 F.2d 1244, 1246 (5th Cir.1978); *Butler's Shoe Corp. v. Pan American World Airways,* 514 F.2d 1283, 1285 n. 2 (5th Cir.1974); *Hughes-Gibb & Co., Ltd. v. Flying Tiger Line, Inc.,* 504 F.Supp. 1239, 1242 (N.D.Ill.1981); *Parke, Davis & Co. v. British Overseas Airways Corp.,* 11 Misc.2d 811, 813, 170 N.Y.S.2d 385, 388 (City Ct.1958).

Although a shipper need not provide a carrier with notice of lost goods under the Convention, the courts have consistently allowed carriers to fix some definite notice period after which the shipper may no longer assert the carrier's liability for the loss. *See Butler's Shoe Corp. v. Pan American World Airways,* 514 F.2d 1283 (5th Cir. 1975); *Famolare, Inc. v. Seaboard World Airlines,* 15 Avi. 17,287 (N.Y.Sup.Ct.1978). These periods are fixed in the Cargo Rules Tariff filed with the Civil Aeronautics Board. *See North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229, 233 (2d Cir.1978); *Crosby & Co., Inc. v. Compagnie Nationale Air France,* 76 Misc.2d 990, 352 N.Y.S.2d 75 (Sup.Ct. 1973), *aff'd,* 42 A.D.2d 1050, 348 N.Y.S.2d 957, *cert. denied,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974); *Federal Aviation. Act of 1958, 49 U.S.C. § 1373(a).* For reasons not relevant, the Seaboard Tariff has no bearing in this case.

The starting point of the inquiry is the language of Article 26. *See* Article 31(1), Vienna Convention on the Law of Treaties. Although one court faced with the same interpretive problem concluded simply that "damage is damage and loss is loss," *Schwimmer v. Air France,* 87 Misc.2d 147, 149, 384 N.Y.S.2d 658, 659 (Civ.Ct.1976),

most courts have not been persuaded that the language of this international treaty is susceptible of such simple parsing. *See, e.g., Eck v. United Arab Airlines, Inc.,* 360 F.2d 804, 812 (2d Cir.1966).

Because "the binding meaning of the terms [of the Convention] is the French legal meaning," *Reed v. Wiser,* 555 F.2d 1079, 1083 n. 7 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977), it is necessary to ascertain the meaning of "avarie," the French word in Article 26 that translates to "damage" in English. *See* II Conference Internationale de Droit Prive Aerien (1930) (reproducing the official French version of the Convention), *cited in Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 33 (2d Cir.1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976) (hereinafter cited as Conference). The underwriters would have us choose the literal meaning of the word, as used commonly in English speech. But as Lord Wilberforce concluded after an exhaustive analysis in the House of Lords, the text of the Convention does not suggest that it was drafted with strict English usage in mind. *Fothergill v. Monarch Airlines, Ltd.,* [1980] 2 Lloyd's L.R. 295, 296, 299 (H.L.) (Q.B.).

First, damage is used interchangeably in American speech and law to refer both to monetary loss and physical damage. Although the French text uses "avarie" interchangeably in some provisions of the Convention, *see, e.g.,* Conference Article 18, it differentiates between the two usages in others, using "dommage" to mean monetary loss and "avarie," physical damage. *See Fothergill v. Monarch Airlines, Ltd.,* [1980] 2 Lloyd's L.R. 295, 299 (H.L.) (Q.B.). Second, "avarie" has both an ordinary meaning, indicating physical damage, and a special mercantile one, derived from French maritime law and indicating physical damage, loss, or partial loss. *Id.* at 300, 307, 310, 316. Although the latter definition has evidently satisfied some scholars, *see id.* at 300, 307, others find it unconvincing. *Id.*

We agree with the *Fothergill* Court that the French terminology is as ambiguous as the English. In sum, a linguistic analysis is inconclusive, indicating at best that the use of "avarie" in Article 26 does not require defining damage to exclude shortages from containers.

■ The Second Circuit has frequently indicated that language is merely one relevant consideration in interpreting the Warsaw Convention. *See Reed v. Wiser,* 555 F.2d 1079, 1088 (2d Cir.1977); *Lisi v. Alitalia Linee Aeree Italiane,* 370 F.2d 508, 511–12 (2d Cir.1966), *aff'd by an equally divided court,* 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968); *Eck v. United Arab Airlines, Inc.,* 360 F.2d 804, 812 (2d Cir. 1966). The fundamental consideration in treaty interpretation is to "effectuate the treaty's evident purposes." *Reed v. Wiser,* 555 F.2d at 1088.

In *Eck v. United Arab Airlines, Inc.,* 360 F.2d 804 (2d Cir.1966), the Second Circuit established some general guidelines for interpreting the Warsaw Convention, emphasizing the need to understand the conditions its provisions were designed to address. It wrote:

A court faced with this problem of interpretation, or another problem like it, can well begin with an inquiry into the purpose of the provision that requires interpretation. The language of the provision ... is ... highly relevant ... but it should never become a "verbal prison." Other considerations, such as the court's sense of the conditions that existed when the language of the provision was adopted, its awareness of the mischief the provision was meant to remedy, and the legislative history available to it, are also relevant .... The inquiry may lead the court to conclude that the provision's language accurately reflects its purpose; in such a situation the court is most faithful to the purpose if the language is interpreted literally. Conversely, the inquiry may lead the court to conclude that the language of the provision only imperfectly manifests its purpose, or that when the words were first chosen the language

accurately reflected the provision's purpose but that today the same words imperfectly reflect this purpose because conditions have changed in the area to which the words of the provision refer. It would be inconsistent ... if the court in the latter situations did not seek to interpret the provision so as to effectuate its purpose, even if this requires departing in some measure from the letter and reading the language in a practical rather than literal fashion.

*Id.* at 812 (citations omitted).

These guidelines suggest that defining the word "avarie" so as to limit its Article 26 meaning to damage not encompassing shortages from a container fails to effectuate the purposes of the Article. As is evident from the foregoing linguistic analysis, the words "avarie" and "damage" do not perfectly manifest the drafters' intentions, whatever they were in 1929. More important, containerization and other new technologies developed in the last fifty years have subjected the air freight industry to drastic changes. These changes require a reading of Article 26 in tune with modern industrial practice and needs.

*Fothergill v. Monarch Airlines, Ltd.,* [1980] 2 Lloyd's L.R. 295 (H.L.) (Q.B.), presented the House of Lords with a problem similar to the one before us. The breadth and depth of the participating judges' analyses entitle their judgment to great weight.

The *Fothergill* case involved an airline passenger who promptly filed a claim for *damage* to his baggage (in the way of a split seam and broken lock), but neglected to file a claim within the time prescribed by Article 26 for the articles he later found *missing* from the baggage. The House of Lords held that the passenger's partial loss of contents was "damage" within the meaning of Article 26 and denied him recovery for failure to make a timely claim for the missing articles.

In reaching its conclusion, the House of Lords first identified four reasons for the timely notice requirements in Article 26: 1) to permit the carrier to check the nature of the damage; 2) to permit the carrier to make inquiries as to how and when the damage occurred; 3) to enable the carrier to assess the possibility and amount of its liability; and 4) to ensure retention of documents, such as the baggage check or air waybill, until the issue of liability is finally disposed. *Fothergill v. Monarch Airlines,* [1980] 2 Lloyd's L.R. at 299. *See also Maschinenfabrik Kern v. Northwest Airlines, Inc.,* 562 F.Supp. 232, 237 (N.D.Ill. 1983) (purpose of Article 26 notice provision is to give carrier opportunity to determine cause of damage). *But see Hughes-Gibb & Co., Ltd. v. Flying Tiger Line, Inc.,* 504 F.Supp. 1239, 1242 (N.D.Ill.1981) (Article 26 provisions developed primarily for use in disputes over value of delivered goods).

The House of Lords then set these reasons for timely notice of damage next to the situation of partial loss of the contents of a bag or other container. It found that the reasons applied with the same force in both the damage and partial loss contexts. A unanimous House of Lords could find no substantial reason for requiring a shipper to make a timely complaint about damage to a container, but not about the loss of all or part of its contents, "especially as the contents will usually be more valuable than the container." *Fothergill v. Monarch Airlines,* [1980] 2 Lloyd's L.R. at 307.

There is no reason to restrict to English cases the conclusion that "it makes commercial sense" to apply the same time limits to both the damage and container shortage situations. *Id.* at 310. *Accord Kumar v. British Airways,* 15 Avi. 17,386 (D.C.Super.Ct.1978); Judgment of Feb. 12, 1982, Hoge Raad der Nederlanden, Neth., RW 1982,50, *reprinted in* Note, *Supreme Court of the Netherlands: Affretair v. V O B or Fothergill's Dutch Treatment,* 7 J.Air L. 173 (1982). *Cf. Hartford Fire Insurance Co. v. Aerolineas Argentinas,* 16 Avi. 17,940 (N.Y.App. Term 1981) (weight shortage in domestic air shipment construed as damage requiring notice within seven days); *Parke, Davis & Co. v. British Overseas Airways Corp.,* 11 Misc.2d 811, 170 N.Y.S.2d 385 (City Ct.

1958) (short shipment of animals construed as damage under Convention). *But see Hughes-Gibb & Co., Ltd. v. Flying Tiger Line, Inc.,* 504 F.Supp. 1239 (N.D.Ill.1981); *Schwimmer v. Air France,* 87 Misc.2d 147, 384 N.Y.S.2d 658 (Civ.Ct.1976); Judgment of Apr. 22, 1982, Bundesgerichtshof in Zivilsachen, W.Ger., [BGHZ] I ZR 86/80.

Theoretically, the concept of "damage" as defined by the House of Lords could be extended to include any kind of shortage, as for example, when only one carton in a shipment of ten is delivered. This broader concept of damage was apparently the basis of the decision by the Supreme Court of the Netherlands in *Affretair v. V O B,* Judgment of Feb. 12, 1982, RW 1982,50, where there was a short delivery of three packages out of twenty. The decision is cogently criticized by one commentator, partly on the ground that in *Affretair,* the short number of packages was visible on a single count, while in *Fothergill,* it was not immediately apparent that any items were missing from the suitcase. Note, *Supreme Court of the Netherlands: Affretair v. V O B or Fothergill's Dutch Treatment,* 7 J.Air L. 173, 176 (1982). As the author put it:

> The present decision is more than an affirmation of the ruling of the House of Lords, which in fact dealt with a case of partial *loss of contents of* a suitcase and not with what Manckiewicz [sic] has described as 'partial loss *stricto sensu',* *viz.,* the loss of one or more packages/suitcases carried under one air waybill/baggage check.

*Id.* at 176 (citation omitted, emphasis in original).

This distinction is the one we adopt. Loss of one or more whole packages— whether cartons, loose pieces, suitcases or containers—may need no written notice. But delivery of a package or container with part of its contents missing is damage and requires notice as held in *Fothergill. See, e.g., Hartford Fire Insurance Co. v. Aerolineas Argentinas,* 16 Avi. 17,940 (N.Y. App. Term 1981) (relying on *Fothergill* to require timely notice of damage for carton

delivered short in weight). The whole *Fothergill* analysis is summed up by Lord Wilberforce when he notes: "I am inclined to agree with Lord Denning, M.R., when he says—'... in art. 18(1) I think "loss of" means loss of the *whole* suitcase.'" *Fothergill v. Monarch Airlines,* [1980] 2 Lloyd's L.R. at 299 (emphasis in original).

Plaintiff underwriters rely on *Dalton v. Delta Airlines, Inc.,* 570 F.2d 1244 (5th Cir.1978) and *Hughes-Gibb & Co., Ltd. v. Flying Tiger Line, Inc.,* 504 F.Supp. 1239 (N.D.Ill.1981), in support of their contention that Article 26 does not cover the short-contents-in-a-container situation. These decisions interpret destruction of all or part of a shipment as "loss" within the meaning of the Convention. *See* Treaty Article 13. They are inapposite. First, the decisions are based on the rationale that lost goods need not be made subject to timely notice requirements because loss, unlike damage, is immediately or inevitably brought to the carrier's attention as soon as the person entitled to delivery fails to receive his cargo. *See Dalton v. Delta Airlines,* 570 F.2d at 1247; *Hughes-Gibb v. Flying Tiger Line,* 504 F.Supp. at 1243. Under this view, the requirement of prompt written notice serves no useful or justifiable purpose when the loss is already obvious to the carrier. *Dalton v. Delta Airlines,* 570 F.2d at 1247. *Accord Hughes-Gibb v. Flying Tiger Line,* 504 F.Supp. at 1243; *American Breeders Service v. KLM Royal Dutch Airlines,* 17 Avi. 17,103, 17,-104 (N.Y.Sup.Ct.1982); *Fothergill v. Monarch Airlines,* [1980] 2 Lloyd's L.R. at 300 (citing treatises to that effect); Judgment of Apr. 22, 1982, BGHZ, W.Ger., I ZR 86/80.

Whatever the strength of this rationale, we find it ill-suited to the loss-from-a-container situation. This is the view of a number of Continental scholars who reason that partial loss, particularly if the result of theft, *a fortiori* constitutes damage requiring immediate notice and investigation. *Fothergill v. Monarch Airlines,* [1980] 2 Lloyd's L.R. at 300. *Accord* Judgment of Feb. 12, 1982, Hoge Raad der Nederlanden,

Neth., RW 1982,50, *reprinted in* Note, *Affretair v. V O B or Fothergill's Dutch Treatment*, 7 J.Air L. 173, 175 (1982).

One need only review the facts before us to understand the need to provide prompt notice of container shortages. Seaboard was not notified about the missing silver until August 15, almost a month after the silver was stolen from Seaboard's warehouse. Before an in-house investigation could be mounted, Seaboard had first to determine whether Rochester Air Freight ever picked up the shipment and then whether Kodak actually sent it on the July 14 waybill.

It is important to recognize that the commercial air freight business is different today than it was in 1929. During the five-year period prior to enactment of the Convention, the cruising speed of America's best plane was 100 to 150 miles per hour and the maximum distance a plane could travel before refueling was 500 miles. *See* Lowenfeld & Mendelsohn, *The United States And The Warsaw Convention*, 80 Harv.L.Rev. 497, 498 (1967) (citing Gibbs-Smith, *The Aeroplane: An Historical Survey* 97–100 (1960)). Total combined domestic and foreign air travel was then measured in millions of passenger miles, instead of the billions of passenger miles it is measured in today. Federal Aviation Administration, U.S. Dep't of Transp., *FAA Statistical Handbook of Aviation*, Tables 6.22, 6.23, at 87 (1977).

When air freight forwarding was first introduced in the 1920's, small packages were the norm. A huge volume of freight is now transported in air and sea cargo containers. *See* Rinaldi, *Containerization, The New Method of Intermodal Transport* 47–48 (1972). In the twenty-year period from 1960 to 1981, express and freight revenues of certificated American route carriers from international air transportation increased from 226 to 2,335 million ton-miles. U.S. Bureau of the Census, *Statistical Abstract of the United States: 1982–1983*, at 633 (103d ed. 1982). From 1975 to 1981, the value of airborne imports and exports to this country increased from 23,471 to 77,199 million dollars. *Id.* at 637. *See also* Federal Aviation Administration, U.S. Dep't of Transp., *FAA Statistical Handbook of Aviation*, Tables 6.10, 6.12, 6.15, at 80, 82, 83 (1977) (reporting revenue ton-miles for the 1968–1977 period); Note, *Transporting Goods By Air*, 69 Yale L.J. 993 & n. 1 (1960) (reporting revenue ton-miles for the 1947–1957 period). Containerization is a post-World War II development. *See, e.g.*, Murr, *Export/Import Traffic Management and Forwarding* 122–23 (5th ed. 1977); Rinaldi, *Containerization, The New Method of Intermodal Transport* at 76. Control of pilferage is one of the main advantages of the containerization system. Rinaldi, *Containerization, The New Method of Intermodal Transport* at 7.

In discussing the import of Article 26 in the context of modern aviation, one court noted:

[T]he most obvious purpose served by the notice requirement ... is to enable airlines who [sic] conduct business on an international scale, using a host of different ... crews and other employees and a variety of changing flight schedules, to investigate damage claims as soon as possible after the events which allegedly caused the damage. If prompt notice were not required, a carrier would often be unable to conduct any detailed investigation into the causes of the alleged damage, in large part because of the inability to identify, weeks or months after the damage has occurred, which employees played a role in processing the baggage or goods in question, or whether there is a possibility that the damage was caused in whole or in part by the negligence of the complaining party. Such determinations are essential from the carrier's standpoint, since under Article 20 [and Article 21 of the Convention the carrier may be exonerated from liability].

*Wexler v. Eastern Airlines*, 18 Avi. 17,155, 17,158 (D.C.Super.Ct.1982).

Based on many criminal prosecutions, this Court takes judicial notice of the steadily increasing incidence of cargo thefts at

Kennedy and other international airports. Fed.R.Evid., Rule 201. A large proportion of such thefts, like the one in the case at hand, are organized by airline or airport employees. Absent a notice provision affording airlines a prompt opportunity to investigate container shortages, the modern problems identified in *Wexler* would severely hinder both the airlines and law enforcement authorities in their efforts to identify those criminally involved and recover stolen cargo. The same criminal actors would then be afforded continued opportunities to repeat their criminal ventures. The airlines, unable to recover lost cargo or identify those who might be held responsible, would be subject to virtually automatic liability and ultimately, to increased insurance costs. To accept such a scenario would contravene a primary purpose of the Convention—to fix at a definite level the cost to airlines of insurance for damage and injury. *See Reed v. Wiser*, 555 F.2d 1079, 1089 (2d Cir.1977). "The history of the Convention from the point of adherence by the United States to the present indicates no change in this fundamental purpose." *Id.* at 1089.

It must be emphasized that we are dealing here with a single container. When one of several separate packages is stolen, the fact is usually obvious. Not so when a portion of the contents of a container or other package is filched. The fact that in the case before us the trucker noticed the shortage at once and orally called it to the attention of the carrier's employees is of no moment. A rule must be devised for the generality of cases and that rule cannot turn on whether or not oral notice is given. Rather, the rule must depend on whether the absence of part of a container's contents should be characterized as damage or loss. It should be noted that the Convention makes no distinction between obvious and hidden damage. *Cf. Kumar v. British Airways*, 15 Avi. 17,386 (D.C.Super.Ct. 1978) (damaged suitcase and missing jewelry, no recovery for jewelry absent timely report of loss).

No American precedent deals as directly or as cogently with the issue as *Fothergill*.

The *Dalton* and *Hughes-Gibb* cases are factually distinguishable. Both cases involved international shipments of live animals that were dead on arrival. The animals were not shipped in sealed containers. The fact that the animals were dead and presented a health problem required immediate action by the carrier and local authorities. *See Dalton v. Delta Airlines, Inc.*, 570 F.2d 1244, 1245 (5th Cir.1978); *Hughes-Gibb v. Flying Tiger Line, Inc.*, 504 F.Supp. 1239, 1241 (N.D.Ill.1981). Such situations do not entail identification of missing cargo or investigations into causation. *See, e.g., American Breeders Service v. KLM Royal Dutch Airlines*, 17 Avi. 17,103 (N.Y.Sup.Ct.1982) (distinguishing *Dalton* and *Hughes-Gibb* in a case of damaged frozen bull semen where destruction of sperm was not apparent). There is little risk that critical documentation will be lost, witnesses will become unavailable or criminal prosecutions will be necessary. *But see Parke, Davis & Co. v. British Overseas Airways Corp.*, 11 Misc.2d 811, 813, 170 N.Y.S.2d 385, 388 (City Ct.1958) (construing partial loss of a shipment of live animals as either Article 26 damage, requiring notice within seven days, or as total loss under Article 13, requiring notice within fourteen days (seven days from the date on which the animals should have arrived)).

Finally, there is a strong policy reason to follow the House of Lords' lead and devise a uniform approach to problems of loss and notice. By definition, the Convention applies to transactions between and among different nations. The insurance and reinsurance industries, as well as shippers and carriers, should be able to assume that the same law applies no matter where the events occur or where the forum. *See, e.g.,* Lowenfeld & Mendelsohn, *The United States And The Warsaw Convention*, 80 Harv.L.Rev. 497, 498–99 (1967).

The underwriters make two final arguments based on Article 26. They first contend that if Article 26 is applicable, the seven-day notice requirement was satisfied by the notations on the Delivery Receipt and the Customs Declaration and by Ko-

chersberger's contemporaneous statements to Seaboard employees. Regardless of whether Seaboard was ever made aware of these circumstances, actual notice of damage may not be substituted for formal written notification.

■ Article 26 requires that every complaint requiring notice be made in a writing either on "the document of transportation" —here the waybill or Tally Form—or in a formal claim. Treaty Article 26(3). This requirement is strictly construed and has been upheld repeatedly by the federal courts with regard to contracts of carriage generally, *see, e.g., Gooch v. Oregon Short Line Railroad,* 258 U.S. 22, 42 S.Ct. 192, 66 L.Ed. 443 (1922); *St. Louis, Iron Mountain & Southern Railway v. Starbird,* 243 U.S. 592, 37 S.Ct. 462, 61 L.Ed. 917 (1917), and by the New York courts with express regard to contracts under the Warsaw Convention. *See Crosby & Co. v. Compagnie Nationale Air France,* 76 Misc.2d 990, 996, 352 N.Y.S.2d 75, 81 (Sup.Ct.1973); *Lady Marlene Brassiere Corp. v. Irish International Airlines,* 13 Avi. 17,428 (N.Y.Civ.Ct. 1971); *Brentwood Fabrics Corp. v. KLM Royal Dutch Airlines,* 13 Avi. 17,246 (N.Y. Civ.Ct.1970).

■ Formal written notice provides the carrier not merely with an indication that a shipment has been damaged, but with an express and definite statement of the shipper's intention to hold the carrier liable. Actual notice gives the carrier nothing to indicate that he, rather than another party, is the object of the shipper's claim. *Lady Marlene Brassiere Corp. v. Irish International Airlines,* 13 Avi. 17,428 (N.Y.Civ.Ct. 1971). *Cf. St. Louis, Iron Mountain & Southern Railway v. Starbird,* 243 U.S. 592, 605, 37 S.Ct. 462, 467, 61 L.Ed. 917 (1917). Neither Kochersberger's oral statements, nor the notations on the Delivery Receipt and Customs Declaration provided Seaboard with this necessary element of notice. *See Lady Marlene v. Irish International,* 13 Avi. 17,428; *Brentwood Fabrics Corp. v. KLM Royal Dutch Airlines,* 13 Avi. 17,246, 17,247 (N.Y.Civ.Ct. 1970). *But see Maschinenfabrik Kern v.*

*Northwest Airlines, Inc.,* 562 F.Supp. 232, 237 (N.D.Ill.1983) (actual notice of possible damage sufficient under Article 26).

■ Next, the underwriters contend that Martinez's refusal to allow Kochersberger's notation on the Tally Form constituted fraud, which under Article 26(4) relieves the shipper from the Article 26 notice requirements. The underwriters' argument is unsupported by any proof other than a letter from their attorney and an affidavit from Kochersberger. Unless an attorney has first-hand knowledge, even his affidavit has no probative force on the fraud issue on a motion for summary judgment. *Rymanowski v. Pan American World Airways, Inc.,* 70 A.D.2d 738, 416 N.Y.S.2d 1018 (1979), *aff'd,* 49 N.Y.2d 834, 404 N.E.2d 1336, 427 N.Y.S.2d 795 (1980). Kochersberger's affidavit merely asserts that he was new to his job and therefore had no reason to believe that Martinez would mislead him.

Since the documents submitted are insufficient to sustain a claim of fraud and the underwriters have submitted no evidence tending to show that the Martinez-Kochersberger exchange prevented Kodak from filing timely notice, the underwriters' claim of fraud can be given no credence on this motion for summary judgment. In any event, it is apparent that Kodak was, or should have been, aware of the shortage from the time that Kochersberger delivered the shipment to Kodak's Rochester headquarters.

All of the underwriters' efforts to take the claim out of Article 26 are without merit. Kodak, a shipper experiencing a shortage of containerized cargo during the course of international transportation, suffered "damage" within the terms of the Convention and was required to file written notice of claim with Seaboard within seven days of delivery. The underwriters have failed to meet the Article 26 notice requirement and cannot recover for the stolen silver unless they can show that another provision of the Convention excuses them from that requirement.

## C. *Articles 5 and 9: Acceptance of Goods Without an Air Waybill*

■ The underwriters maintain that Seaboard is barred from asserting the notice provisions of the Convention because the carrier accepted the shipment on July 11, three days before executing a waybill for the Kodak cargo.

Failure to issue a waybill is governed by two separate provisions of the Convention. Article 5(2) states that the absence of a waybill "shall not affect the existence or the validity of the contract of transportation which shall, subject to the provisions of Article 9, be none the less governed by the rules of this convention." Article 9 provides that a carrier "accept[ing] goods without an air waybill having been made out ... shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability."

Like the Second Circuit, which sought to construe virtually identical language in Article 3 (governing delivery of passenger tickets), this Court must divine what the treaty-writers meant by these apparently conflicting provisions. *See Stratis v. Eastern Air Lines, Inc.,* 682 F.2d 406, 412 (2d Cir.1982). Did the writers intend the Article 26 notice provision to operate as a *rule* of the Convention, pursuant to Article 5, or as a *provision of the Convention excluding or limiting the carrier's liability,* pursuant to Article 9? If Article 26 is merely a rule, the carrier's failure to issue a waybill upon receiving the container would have no effect on the requirement that Kodak file a notice of claim within seven days. Alternatively, if Article 26 is a provision excluding or limiting liability, Seaboard's failure to issue a waybill would bar the carrier from asserting Kodak's failure to file timely notice.

We are unable to find any federal case deciding whether the Article 26 notice provision is one "excluding or limiting liability" within the ambit of Article 9, or merely a "rule of the Convention" under Article 5(2). The cases construing analogous provisions support a finding that only a "rule" was violated. *See* Treaty Articles: 3 (passenger tickets), *e.g., Stratis v. Eastern Air Lines, Inc.,* 682 F.2d 406 (2d Cir.1982); *Lisi v. Alitalia-Linee Aeree Italiane,* 370 F.2d 508 (2d Cir.1966); *Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851 (2d Cir.), *cert. denied,* 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965); 4 (baggage checks), *e.g., Lisi v. Alitalia,* 370 F.2d 508; *Wexler v. Eastern Airlines,* 18 Avi. 17,155 (D.C.Super.Ct.1982); *Sofranski v. KLM Royal Dutch Airlines,* 68 Misc.2d 402, 326 N.Y. S.2d 870 (Civ.Ct.1971); 25 (willful misconduct), *e.g., Stone v. Mexicana Airlines, Inc.,* 610 F.2d 699 (10th Cir.1979); *Bergman v. Pan American World Airways, Inc.,* 32 A.D.2d 95, 299 N.Y.S.2d 982 (1969); 29 (statute of limitations), *e.g., Molitch v. Irish International Airlines,* 436 F.2d 42 (2d Cir.1970); *Bergman v. Pan American,* 32 A.D.2d 95, 299 N.Y.S.2d 982.

Analysis of these cases leads to the conclusion that the Article 26 notice provision is not one excluding or limiting liability within the meaning of Article 9. The exclusions and limitations referred to in Article 9 are directed exclusively to those provisions of the Convention expressly limiting the carrier's liability and the amount of damage a shipper may recover. *See Wexler v. Eastern Airlines,* 18 Avi. 17,155, 17,158 (D.C.Super.Ct.1982); Treaty Articles 20 & 22.

The very form of Article 26 suggests that it is not affected by the waybill requirement. Clause 4 of Article 26 states a single, explicit limitation on the Article's effectiveness: fraud. The clause reads: "Failing complaint within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on his part." This provision is much like that in Article 29(1) concerning the statute of limitations; yet Article 29 is not construed as a provision excluding or limiting liability under Article 9. *See, e.g., Molitch v. Irish International Airlines,* 436 F.2d 42 (2d Cir. 1970).

In any event, Seaboard's failure to execute a waybill at the same time as it accepted the Kodak cargo was a "technical irregularity," rather than an error going "to the

very heart" of the Convention's delivery requirement." *Stratis v. Eastern Air Lines, Inc.,* 682 F.2d 406, 411 (2d Cir.1982). The irregularity was cured by execution of the waybill on July 14, three days before the Kodak cargo was shipped to New York. *Cf. North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229 (2d Cir.1978) (failure to provide waybill harmless where terms and limitations made known to shipper through tariff filed with Civil Aeronautics Board). Compare the language of Article 9 in the 1929 Convention ("accepts goods without an air waybill having been made out") with that in the 1955 Hague Amendment to Article 9 ("cargo is loaded on board ... without an air waybill having been made out"). Mankiewicz, *The Liability Regime Of The International Air Carrier* 203 (1981).

The Court of Appeals for the Second Circuit has held consistently that the only provisions of the Warsaw Convention excluding or limiting a carrier's liability are those in Articles 20 and 22. In *Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851 (2d Cir.1965), the court construed the Article 3(2) ticket delivery requirements and held that a carrier's failure to deliver a ticket to a passenger in circumstances which afforded the passenger adequate notice of the Convention's Article 22 liability provisions barred the carrier from asserting those limitations against a passenger claim. The language in Article 3(2) is analogous to the language in Articles 5 and 9. In *Lisi v. Alitalia-Linee Aeree Italiane,* 370 F.2d 508 (2d Cir.1966), the court extended this holding to require adequate notice on baggage checks. Thus a carrier whose baggage checks do not include adequate notice of the Convention's liability limitations is also barred, under Article 4(4), from asserting those limitations. The language in Article 4(4) is virtually identical to the language in Articles 5 and 9.

In *Molitch v. Irish International Airlines,* 436 F.2d 42 (2d Cir.1970), the court drew the line. It refused to include the Article 29 statute of limitations provision in the constellation of provisions excluding or limiting a carrier's liability. In holding that no notice of the statute of limitations need be provided on a passenger ticket, the court said:

> Article 29(1) is not a provision which "exclude[s] or limit[s] liability" within the meaning of Article 3(2). The *Lisi* case held only that Articles 20 and 22, which provide for limitations of the amount of damages recoverable against an airline under the Convention, are provisions excluding or limiting liability under Article 3(2). An extension of *Lisi* to cover Article 29(1) would be unwarranted.

*Id.* at 44 (citations and footnote omitted).

The *Molitch* Court also reiterated its position concerning the exclusion and limitation references in Article 25 (willful misconduct). Those references, like the ones in Article 29, are directed only to Articles 20 and 22. *Id.* at 44 n. 1 (citing *Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532 (2d Cir.1965), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966); *LeRoy v. Sabena Belgian World Airlines,* 344 F.2d 266 (2d Cir.), *cert. denied,* 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965); *Grey v. American Airlines, Inc.,* 227 F.2d 282 (2d Cir.1955), *cert. denied,* 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956). *See also Stone v. Mexicana Airlines, Inc.,* 610 F.2d 699 (10th Cir.1979); *Bergman v. Pan American World Airways, Inc.,* 32 A.D.2d 95, 299 N.Y.S.2d 982 (1969) (language of Article 25 barring carrier from relying on Convention's provisions excluding or limiting liability does not allow a passenger to avoid the Article 29 statute of limitations).

Finally, in *Butler's Shoe Corp. v. Pan American World Airways, Inc.,* 514 F.2d 1283 (5th Cir.1975), a case factually similar to this one, the Fifth Circuit denied recovery to a shipper who failed to file a claim for lost goods within the 120-day period specified in the carrier's tariff. The shipper had contended in District Court that the tariff provision was one "tend[ing] to relieve the carrier of liability" and thus could not be asserted by the carrier as an

affirmative defense. *Id.* at 1284. The Court of Appeals disagreed. It said:

> We cannot agree that the 120-day notice provision is one "tending to relieve the carrier of liability." Although it may operate to bar recovery, we do not believe that it is properly considered a limitation on liability within the intendment of the Convention. In Warsaw Convention cases, limitation periods imposed by the Convention or by contract have not been held to be provisions limiting or excluding liability.

*Id.* at 1285. *Cf. Abdul-Haq v. Pakistan International Airlines*, 101 Misc.2d 213, 214, 420 N.Y.S.2d 848, 850 (Sup.Ct.1979) (carrier not required to provide multilingual notice of liability limitations on air waybill in order to assert notice of claim provision against passenger). *But see Sofranski v. KLM Royal Dutch Airlines*, 68 Misc.2d 402, 326 N.Y.S.2d 870 (Civ.Ct.1971) (Convention's notice of claim requirement is provision excluding or limiting liability and requires advance notice to passenger).

It is evident from the foregoing that a carrier's failure to issue a waybill prior to accepting cargo from a shipper may, in a proper case, prevent the carrier from asserting the exclusion and limitation of liability provisions of Articles 20 and 22. However, such a failure will not bar a carrier from asserting the Convention's statute of limitations or notice of claim provisions.

Were the law concerning the Convention's exclusions and limitations less clear, we would still have little difficulty in reaching the same conclusion on the facts in the case before us. The air waybill requirement, like the requirements for passenger and baggage ticket delivery, is premised on the notion that the shipper (or passenger) should be made aware that the Warsaw Convention applies to his flight and of the consequent limitations on the carrier's liability. *See Stratis v. Eastern Air Lines, Inc.*, 682 F.2d 406, 411 (2d Cir.1982); *Molitch v. Irish International Airlines*, 436 F.2d 42, 44 (2d Cir.1970); *Lisi v. Alitalia-Linee Aeree Italiane*, 370 F.2d 508, 513 (2d Cir.1966); *Mertens v. Flying Tiger Line, Inc.*, 341 F.2d 851, 856 (2d Cir.1965).

Just as the notices on flight and baggage tickets afford passengers an opportunity to protect themselves from the effects of the Convention's liability limitations (via the purchase of insurance, for example), the notices in the waybill provide shippers with an opportunity to declare an excess value for their cargo and to pay an additional charge in order to avoid the applicable liability limitations. *Cf. Mertens v. Flying Tiger Line, Inc.*, 341 F.2d 851, 856–57 (2d Cir.1965) (purpose of passenger ticket delivery requirement); *North American Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 235 (2d Cir.1978) (Oakes, J., concurring) (purpose of air waybill delivery requirement). The carrier will only be barred from asserting the Convention's liability limitations if it fails to deliver any ticket whatsoever, delivers a ticket containing inadequate warnings, or delivers a ticket with adequate warnings, but fails to allow the passenger enough time to take precautions. *See, e.g., In re Air Crash Disaster at Warsaw, Poland*, 535 F.Supp. 833 (E.D.N.Y.1982), *aff'd*, 705 F.2d 85 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 147, 78 L.Ed.2d 138 (1983); *Lisi v. Alitalia-Linee Aeree Italiane*, 370 F.2d 508 (2d Cir.1966); *Mertens v. Flying Tiger*, 341 F.2d 851; *Warren v. Flying Tiger Line, Inc.*, 352 F.2d 494 (9th Cir.1965). *See also* Mankiewicz, *The Liability Regime Of The International Air Carrier* 203 (1981) (indicating that Article 9 language requiring carrier to execute waybill on acceptance of goods was amended at 1955 Hague Conference to allow execution prior to loading of cargo "on board the aircraft").

There is no question that Kodak had ample time from July 14 when the waybill was executed, until July 17 when the container left London, to become familiar with the notice and liability provisions on the waybill, declare an excess value on the silver, and pay any additional costs. Accordingly, the underwriters may not use Seaboard's failure to execute the waybill

**1148**

on July 11 to circumvent Kodak's failure to file a timely notice of claim.

Kodak's assertion of Article 25 to avoid the notice requirement is equally unavailing. Article 25 prohibits a carrier from utilizing the Convention's exclusion and limitation of liability provisions when the shipper's damage has been caused by the carrier's willful misconduct or by the misconduct of the carrier's agent acting within the scope of his employment. Treaty Article 25(1) & (2).

As is apparent from the foregoing discussion, a shipper's allegations of willful misconduct may prevent the carrier from asserting the limitations of Articles 20 and 22. But they will not prevent the carrier from asserting the Convention's notice of claim provision. Moreover, the record here is devoid of any proof tending to show that Seaboard engaged in willful misconduct. The theft of the silver by Seaboard's employees "cannot impute to Seaboard the misconduct which would avoid the limitation of the convention." *Eve Boutique Imports, Inc. v. Seaboard World Airlines, Inc.*, 10 Avi. 17,703, 17,704 (N.Y.Sup.Ct. 1968).

The burden of establishing willful misconduct rests on the plaintiff. *Rymanowski v. Pan American World Airways, Inc.*, 70 A.D.2d 738, 416 N.Y.S.2d 1018 (App.Div.1979). In order to impute an employee's willful misconduct to his employer, plaintiff must show that the damage caused by the employee's actions occurred because the employee was acting within the scope of his employment. *Id.* Under New York law, an employee acts within the scope of his employment "when he is doing something in furtherance of the duties he owes to his employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities." *Lundberg v. State*, 25 N.Y.2d 467, 470, 255 N.E.2d 177, 179, 306 N.Y.S.2d 947, 950 (1969); *Sauter v. New York Tribune, Inc.*, 305 N.Y. 442, 113 N.E.2d 790 (1953).

The underwriters charge Seaboard's employees with theft, a tortious act. Sea-

board cannot be held to have acted wrongfully with respect to notice. Like Kodak and the underwriters, it was a victim, not a perpetrator.

### III. CONCLUSION

Defendants' motion for summary judgment is granted. The case is dismissed without costs or disbursements.

SO ORDERED.