737 F.2d 172
 M.E. DENBY, Individually and on behalf of certain other
concerned Underwriters at Lloyds, Plaintiffs-Appellants,
v.
SEABOARD WORLD AIRLINES, INCORPORATED and Flying Tiger Line,
Incorporated, Defendants-Appellees.
 No. 1127, Docket 84-7018.
 United States Court of Appeals,
Second Circuit.
 Argued April 16, 1984.
Decided June 7, 1984.
 
 Leonard S. Leaman, Lord, Day & Lord, New York City, for plaintiffs-appellants.
 Francis A. Montbach, Bigham, Englar, Jones & Houston, New York City, for defendants-appellees.
 Before FRIENDLY, PIERCE and WINTER, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal is from an order of Chief Judge Weinstein in the District Court for the Eastern District of New York, 575 F.Supp. 1134, granting summary judgment to the defendants in an action by the insurers of a shipper for loss of cargo. The basis for the order was the shipper's alleged failure to give notice of the loss within seven days after receipt of the cargo as required by Article 26(2) of the Warsaw Convention.[1] The appeal presents important questions concerning the meaning of Article 26(2), particularly in regard to air freight container shipments. Although we agree with much of Chief Judge Weinstein's scholarly opinion, we believe decision hinges on factual questions that were not appropriate for resolution on the papers before the court and therefore reverse the order granting summary judgment and remand for a trial.
 
 The Facts
 
 2
 Plaintiff Denby, representing a group of insurance underwriters at Lloyds, brought this action to recover $673,190.16, the market value of thirty-six kegs of silver residue and flake shipped by the subrogor, Kodak Limited (Kodak), from England to John F. Kennedy International Airport in New York City by defendant Seaboard World Airlines, Inc. (Seaboard).[2]
 
 
 3
 On July 11, 1980,[3] a driver employed by Seaboard delivered one of its standard ten-foot fiberglass containers to Kodak's plant outside of London. A Kodak employee loaded the container with forty cartons, consisting of thirty-six kegs of silver flake and residue and four skips of scrap sensitized paper. He then closed the container's doors and affixed a seal. The driver signed a receipt and delivered the container to Seaboard's warehouse at Heathrow Airport where it was stored. On July 14 a Kodak employee delivered an air waybill relating to the shipment, consisting of an original and thirteen copies, to Seaboard's Heathrow office. The air waybill described the number of packages as "1" and stated the weight and charges. Under the heading "Nature and quantity of goods (incl. dimension or volume)," the airway bill said:
 
 SCRAP PAPER & SILVER RESIDUE FOR
 SILVER RECOVERY PURPOSES
 8.32m 3
 SPECIAL INSTRUCTIONS
 CONTAINER ARA5661 SB, SAID
 CONTAIN 40 PACKAGES No.s KRO1
 
 4
 1/26.KPO53/1-4,KLOO 4/1-10.
 
 
 5
 In another box, "Handling information", the air waybill stated:
 
 C.A.N. 80172 2 Commercial Invoices
 1 CONTAINER ARA 5661
 
 6
 A/F 1/10.
 
 
 7
 Later Seaboard certified on the air waybill that the container had been shipped on flight 305 on July 16.
 
 
 8
 Flight 305 arrived in New York at 12:25 a.m. on July 17. The container was stored in Seaboard's warehouse until July 18 when Edward Kochersberger, a driver for Rochester Air Freight, commissioned by the consignee, Eastman Kodak Co. (Eastman), arrived to pick up the shipment. Precisely what happened then is not completely clear, as will be explained below; it suffices here to say that Kochersberger received only four cartons instead of forty.
 
 
 9
 On August 26 Eastman gave written notice to Seaboard claiming the loss of thirty-six kegs of silver residue and flake. The notice said:
 
 
 10
 The consignment consisted of 40 pieces. However, when the container was opened at the Seaboard World Airlines warehouse, only four bails of silver flakes were in the container.
 
 
 11
 Nearly a month later Eastman corrected the notice to say that the four barrels were scrap paper, not silver flakes.
 
 The Proceedings in the District Court
 
 12
 The complaint of Denby as Eastman's subrogee characterized the shipment as having been of thirty-six kegs of silver flake and residue and four skips of scrap sensitized paper; the answer characterized it as a shipment of "one (1) container said to contain 'Scrap Paper and Silver Residue for Silver Recovery Purposes' ". Defendants later moved for summary judgment on the ground that Eastman had failed to give timely notice of the loss as required by Article 26(2) of the Warsaw Convention.
 
 
 13
 After appropriate further proceedings, Chief Judge Weinstein granted the motion. The bulk of his opinion was devoted to Eastman's claim that the case was not one of "damage", for which Article 26(2) provides a seven day notice requirement, but of loss, for which no time limitation is set. He rejected this largely on the basis of the decision of the House of Lords in Fothergill v. Monarch Airlines, Ltd., [1980] 2 Lloyd's L.R. 295 (hereafter cited by page number only) that the loss of part of the contents of a passenger's suitcase constituted damage to baggage, a claim for which was barred by failure to make a complaint within seven days from the date of receipt.[4] He then rejected plaintiff's argument that certain acts of Seaboard's employees with respect to Kochersberger, hereafter discussed, constituted "fraud" within the meaning of Article 26(4), 575 F.Supp. at 1144, as well as arguments, no longer pressed, that Seaboard was barred from relying on the notice provisions of Article 26 by its having accepted the shipment on July 11, three days before issuing an air waybill, see id. at 1145-48, or by its having engaged in willful misconduct under Article 25, see id. at 1148.
 
 DISCUSSION
 
 14
 (1) Application of Article 26(2) of the Warsaw Convention
 
 
 15
 As noted in Reed v. Wiser, 555 F.2d 1079, 1082 n. 5 (2 Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977), "[i]n order to insure uniformity of interpretation, which was one of the paramount objectives of the Convention," the text, as stated in Article 36, "est redigee en francais en un seul exemplaire" ["is drawn up in French in a single copy"]. It was this text which the Senate ratified and the President proclaimed, 49 Stat. 3000 (1934). Immediately following the French text is an English translation which apparently was before the Senate, id. at 3014.
 
 
 16
 The French text of Article 26 reads as follows:
 
 
 17
 (1) La reception des bagages et marchandises sans protestation par le destinataire constituera presomption, sauf preuve contraire, que les marchandises ont ete livrees en bon etat et conformement au titre de transport.
 
 
 18
 (2) En cas d'avarie le destinataire doit adresser au transporteur une protestation immediatement apres la decoverte de l'avarie et, au plus tard, dans un delai de trois jours pour les bagages et de sept jours pour les marchandises a dater de leur reception. En cas de retard, la protestation devra etre faite au plus tard dan les quatorze jours a dater du jour ou le bagage ou la marchandise auront ete mis a sa disposition.
 
 
 19
 (3) Toute protestation doit etre faite par reserve inscrite sur le titre de transport ou par un autre ecrit expedie dans le delai prevu pour cette protestation.
 
 
 20
 (4) A defaut de protestation dans les delais prevus, toutes actions contre le transporteur sont irrecevables, sauf le cas de fraude de celui-ci.
 
 The English translation of this was:
 
 21
 (1) Receipt by the person entitled to the delivery of baggage or goods without complaint shall be prima facie evidence that the same have been delivered in good condition and in accordance with the document of transportation.
 
 
 22
 (2) In case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and, at the latest, within 3 days from the date of receipt in the case of baggage and 7 days from the date of receipt in the case of goods. In case of delay the complaint must be made at the latest within 14 days from the date on which the baggage or goods have been placed at his disposal.
 
 
 23
 (3) Every complaint must be made in writing upon the document of transportation or by separate notice in writing dispatched within the times aforesaid.
 
 
 24
 (4) Failing complaint within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on his part.
 
 
 25
 In view of the importance which the district judge properly attached to the decision of the House of Lords in Fothergill v. Monarch Airlines, Ltd., supra,[5] we begin with a statement of the simple facts of the case, p. 297, to show how far it controls the case at bar and how far it does not. Mr. Fothergill arrived at Luton Airport in March, 1975, after a flight from Italy to England. When his registered baggage, a suitcase containing his personal effects, was delivered to him, he noticed that it was damaged. He immediately filed a Property Irregularity Report on a printed form; under the heading "Nature of Damage" there was inserted:
 
 
 26
 Side seam completely parted from the case. Damage occurred on inbound flight.
 
 
 27
 The damage to the suitcase was later fixed at pounds sterling 12.50, the airline accepted liability, and this did not figure further. After reaching home Mr. Fothergill discovered that some of the contents were missing: a shirt, a pair of sandals and a cardigan, valued at pounds sterling 16.50. He made a claim against his insurers for this amount, which was satisfied. Thereafter, the insurers brought suit to recover this added amount, although Mr. Fothergill had given no further notice of loss to Monarch. The House of Lords agreed that the suit was barred by failure to give notice within the time limited by Article 26(2) of the Convention.[6]
 
 
 28
 The House of Lords was applying not the Warsaw Convention as amended by the Hague Protocol but the Carriage by Air Act, 1961, 9 & 10 Eliz. 2, ch. 27, Sec. 1(1) & sched. 1, which adopted these as British law. An English text had been annexed as Part I of a first schedule to that Act, and the French official text as Part II. Section 1(2) of the Act provided that if there was any inconsistency between the two texts, the French text should prevail. Hence Lord Wilberforce correctly announced that the first task was to interpret the English text, since only by doing this could one see whether there was any inconsistency between the English and French texts; if there was, interpretation of the controlling French text would follow, p. 298. In theory an American court should first approach the French text, since this is what the Senate ratified and the President proclaimed. As a practical matter, however, American lawyers and courts have initially addressed themselves to the English text and have consulted the French text only when there is a substantial contention that it has a different meaning. See, e.g., Block v. Compagnie Nationale Air France, 386 F.2d 323, 328 n. 9 (5 Cir.1967) (Wisdom, J.), cert. denied, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). Such a course is also reasonable since, to paraphrase Lord Scarman's speech in Fothergill, p. 311, the English text is after all the meaning which the members of the Senate, not all of whom were fluent in French, believed the French text to have.
 
 
 29
 One transparently clear observation is that Article 26(2) does not apply to a case of total loss, i.e., a case where the "shipment" never arrives. This must be so since whatever meaning might otherwise attach to "damage," the notice must be given within a period of seven days from the receipt of goods and when there has been a total failure to deliver, the period never starts to run. When there has been a delivery of sorts, the issue becomes more problematic. One's instant reaction is that while the laceration of Mr. Fothergill's suitcase clearly was "damage", the extraction of his shirt, sandals and cardigan was something else. Lord Wilberforce noted, p. 299, however, that the word "damage" was used in the Convention in more than one sense and thus the resulting ambiguity made it proper to resort to the purpose of Article 26.[7] He concluded, p. 299, that "[i]f one then enquires whether these considerations are relevant to a case of partial loss of objects contained in baggage, the answer cannot be doubtful: they clearly are." Turning to the French text he found this more consistent than the English in that it confined the use of the word "dommage" to monetary loss and, when physical damage was in question, used the word "avarie", as it did in Article 26(2). That, however, did not end the matter. French dictionaries suggested "that 'avarie' has both an ordinary meaning and a special meaning as a term of maritime law. In the ordinary meaning, the word signifies physical damage to a movable; in its special meaning, it is capable of meaning physical damage, or loss, including partial loss", p. 300. He then turned to French, Belgian, Swiss and Argentine legal writers who had expressed the view that Article 26(2) should be construed as extending to partial loss. On these bases he concluded that Mr. Fothergill's claim was barred. As we read the speeches of the other law lords, none differed essentially with this reasoning, although Lord Scarman thought it clearer that the decision was departing from the literal meaning of both the English and the French words in the interests of "commercial sense", p. 310.
 
 
 30
 Such real division as there was among the law lords concerned whether and, if so, how much reliance could be placed upon a debate at the Hague Convention in 1955. See 1 International Conference on Private Air Law, The Hague, September 1955, Minutes 398-99 (ICAO Doc. 7686-LC/140 1956). The remarks read as follows:
 
 
 31
 Mr. Drion (Netherlands) proposed, seconded by Mr. Sidenbladh (Sweden), the addition of the words "or partial loss" after the word "damage".
 
 
 32
 Mr. Calkins (United States) said that, although this proposal might well clarify the law after the Protocol had been adopted and was in effect, what would be the construction put on the present text pending that time? It went without saying that "damage" included "partial loss". He was opposed to the Netherlands proposal.
 
 
 33
 Mr. Loaeza (Mexico), Chairman of the Drafting Committee, speaking as the Mexican Delegate, said it was not necessary to insert the words "or partial loss" after the word "damage".
 
 
 34
 Messrs. Drion (Netherlands) and Sidenbladh (Sweden) withdrew their proposal on the understanding that the word "damage" was to be understood as including the words "partial loss".
 
 
 35
 Lord Fraser thought that any recourse to this material was improper, pp. 308-09; the other law lords thought the contrary but warned that such use must, in Lord Wilberforce's phrase, be "cautious", p. 302. While appellees are correct in saying that American courts exhibit much less reticence in relying on legislative history and point to the copious references to The Hague minutes in Reed v. Wiser, supra, 555 F.2d 1079,[8] see also the use of the Warsaw minutes in Trans World Airlines, Inc. v. Franklin Mint Corp., --- U.S. ----, 104 S.Ct. 1776, 1786 & n. 33, 80 L.Ed.2d 273 (1984); id. at 1790 (Steven, J., dissenting); Block v. Compagnie Nationale Air France, supra, 386 F.2d at 332 n. 25, we find this debate quite unimpressive.[9]
 
 
 36
 Like the district judge we would cheerfully apply Fothergill to facts such as were there presented. We likewise have no difficulty in approving, as he did, 575 F.Supp. at 1141, Hartford Fire Insurance Co. v. Aerolineas Argentinas, 16 Av.Cas. (CCH) 17,940 (N.Y.App.Term 1981), which applied Fothergill so as to require timely notice of damage for a carton which was delivered short in weight. But caution is demanded when we turn from these simple cases to container shipments--a development which has proved to be as revoluntionary in shipments by air as by sea.
 
 
 37
 The district court understated the case when it said, 575 F.Supp. at 1137:
 
 
 38
 Containerization, which entails loading separately packaged goods and loose objects into one large reusable metal or fiberglass package, represents a technique probably unknown to the Convention's drafters.
 
 
 39
 In 1929 cargo was carried in the cargo compartments of passenger aircraft; the small size of these and the high cargo rates generally prohibited the air transportation of anything other than relatively small packages, which possessed high value either intrinsically, e.g., precious metals, or because speed in transportation was essential, e.g., designer clothing, newspapers and motion picture films. The development of all cargo aircraft and of large-bellied passenger airplanes was not then foreseen. Containerization had not yet become a factor even in maritime transport.[10] While containers had become widely used in air transport by 1980 when Fothergill was decided, the "container" in question in that case was a suitcase. Fothergill thus is simply the beginning of our inquiry.
 
 
 40
 The rationale of Fothergill would dictate that if the container here in question had itself been delivered in sealed condition to Eastman's truckman and, on its arrival at Eastman's plant, some cartons were found to be missing or stuffed with rags, Eastman would have had to give notice within seven days after receipt.[11] Very likely the same would be true if, after delivery of the sealed container, all the cartons were found to be missing[12] or stuffed with worthless material. We read the frequent references to "partial loss" in Fothergill as distinguishing loss of contents from non-delivery of the suitcase, not as meaning that a different result would have been reached if, on arriving at home, Mr. Fothergill had discovered that all the contents of his suitcase had been removed and replaced by wrapping paper.[13] On the other hand, if Kodak had dispatched the forty cartons as such, Seaboard had loaded them in a container at Heathrow for its own convenience and had delivered only four, and Eastman had failed to give notice within seven days, Article 26(2) would not be a bar, even though some of the purpose limned by Lord Wilberforce would be served by requiring prompt notice in such an instance.[14] Cf. Dalton v. Delta Airlines, Inc., 570 F.2d 1244, 1247 (5 Cir.1978); Hughes-Gibb & Co. v. Flying Tiger Line, Inc., 504 F.Supp. 1239, 1242-43 (N.D.Ill.1981). Our difficulty is two-fold: the case does not lie at either of these poles, and we do not know exactly what the facts are.
 
 
 41
 Seaboard's motion for summary judgment was supported by an affidavit of Michael Iacovelli, its Director-Insurance and Claims, to which several exhibits were attached. After reciting the history of the shipment prior to the arrival in New York, which is not in dispute, the affidavit states, rather blandly:
 
 
 42
 Upon arrival, the consignee's broker was notified in order that said broker could arrange for the clearance of the shipment with U.S. Customs and its pick-up by the trucker who would transport it to the ultimate destination in Rochester, New York. Once those arrangements were made, the shipment was picked up, without exception, by Rochester Air Freight, the truckman employed by the consignee to transport the shipment to Rochester.
 
 It goes on to say that
 
 43
 [a]t the time of pick-up, by Rochester Air Frieght [sic] on July 18, 1980, the pick-up driver acknowledged receipt of the shipment in good order and condition, as can be seen from the annexed Pick Up Order and Tally Form (Exhibit "B").
 
 
 44
 The Pick Up Order and Tally Form, a form prepared by Seaboard, described, in typewriting, the number of pieces as "1", and the commodity description as "Scrap Paper & Silver Residue", with a weight of 9829 pounds.[15] Kochersberger signed the form, acknowledging receipt of "1" package and the U.S. Customs affixed a stamp also apparently containing the figure 1. Another affidavit, by Francis A. Montbach, Esq., one of Seaboard's attorneys, after alleging that a sealed container was delivered to Seaboard in England, states that "[t]his same container was delivered to the consignee's truckman, Rochester Air Freight, on July 18, 1970, without any exception being noted on the delivery receipt." On the other hand, as already noted, Eastman's notice of claim dated August 26, 1980, which also was attached to Iacovelli's affidavit, referred to the consignment as having consisted of forty pieces.
 
 
 45
 Plaintiff responded with affidavits indicating that the delivery at Kennedy Airport had not taken the smooth and routine course depicted by Seaboard.[16] The Rochester Air Freight truckdriver, Kochersberger, began by saying that he and his company had been instructed to pick up "the contents of the container" and to transport the "container contents" from Kennedy Airport to Eastman's plant in Rochester. The affidavit continues as set forth in the margin.[17] The delivery receipt bore the typed notation "ONE CONTR S.T.C. 40 PCS PHOTO GOODS" with a weight of 9829 lbs., under which there appears in handwriting. The Customs Service Transportation Entry and Manifest bore the typed legend:
 
 
 46
 1 CONTAINER SAID TO CONTAIN 40 PCS--SCRAP PAPER AND SILVER RESIDUE FOR RECOVERY PURPOSES[,]
 
 
 47
 with a gross weight of 9829 pounds. This was followed by a written legend:
 
 
 48
 Packed with Four cardboard containers retaped after Inspection[,]
 
 
 49
 and then what we take to be the name of the Customs Inspector and the date.
 
 
 50
 A flurry of reply affidavits followed. Most of Mr. Montbach's affidavit dealt with matters of law. He also made the point that Seaboard had no means of knowing that the container received at Heathrow in fact contained forty cartons rather than four--a point not having much weight in view of the fact that Seaboard itself had verified the weight stated in the air waybill prepared by Kodak and somewhat increased it to take account of the container's weight, and his concession that "Seaboard received a sealed container, which container was pilfered while in Seaboard's custody." Iacovelli repeated that Kodak had arranged for the shipment of a sealed container which it had loaded and that Seaboard "delivered the same container, without written exception, to Rochester Air Freight on July 18, 1980"--statements that were the truth but hardly the whole truth. Kochersberger, the only affiant with personal knowledge of what happened at Kennedy Airport on July 18, filed a further affidavit. This repeated much of what he had said before but went on to allege facts on which plaintiff would rely in support of its claim that it came within the fraud exception of Article 26(4) as well as some others; we quote the relevant portions in the margin.[18]
 
 
 51
 We cannot be sure from all this whether Seaboard delivered the container or only the four cartons. On the face of the documents and some of the affidavits, it did the former. If that was the fact and such action conformed to the intention of the parties or the custom of the trade, there would be a strong argument for applying Fothergill. Eastman would have received the container, for which it had bargained, even though nine-tenths of its contents had disappeared. The difference from Fothergill, namely, that the carrier's employees knew of the partial loss at the time of delivery, while important, may not be decisive. As Chief Judge Weinstein pointed out, 575 F.Supp. at 1142-43, prompt notice in the form of a claim serves the purposes set forth by Lord Wilberforce in Fothergill, p. 299, even in such a case; the carrier's employees who know of the loss may be the very ones who caused it, as apparently was true here.[19] On the other hand, it is somewhat hard to believe, in the absence of more explicit evidence, that Kochersberger would receive and transport a container weighing more than 700 pounds to Rochester when nine-tenths of its containers were gone--unless Eastman had need of it for another shipment, which nothing in the papers suggests. It is certainly possible that Kochersberger, an inexperienced driver, simply signed what was put before him, and carried only the four cartons and not the container. If in fact, whether by intent or custom and practice, the contract was one whereby Seaboard was to transport the container to the New York airport, and then unpack it and deliver the contents to Eastman and Seaboard's employees stole the contents in the course of the unloading,[20] to characterize the case as one of "damage" might be pressing the claims of purpose against language further than the bow will bend.[21] Another possible state of facts is that the contract was for the delivery of the container but that Seaboard breached the contract by unpacking the container. Still another is that the opening and unpacking of the container were for Eastman's convenience because Kochersberger's truck could not carry the container.
 
 
 52
 We prefer not to decide how far to extend Fothergill to container shipments--an issue of importance not simply to these parties but to many others, in the absence of a complete record with respect both to the facts of this case and the custom of the trade. Since there is a disputed issue of fact which might lead to a result different from that reached by the district court and we are now obliged to take the version most favorable to plaintiff, see, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2 Cir.1982); Burtnieks v. City of New York, 716 F.2d 982, 985 (2 Cir.1983), we are constrained to reverse the grant of summary judgment to the defendants on this ground alone.
 
 
 53
 (2) The fraud exception
 
 
 54
 As previously noted, plaintiff contended that even if Article 26(2) applies, the operative section, Article 26(4), which bars an action against the carrier in case of default in the giving of notice does not apply because of the exception, "save in the case of fraud on his part." The argument is that Seaboard's employees dissuaded Kochersberger from taking action that would have complied with Article 26(2) and (3). Seaboard responds (i) that such dissuasion does not constitute fraud within Article 26(4); (ii) that there was no dissuasion since Kochersberger was told only that it was not proper for the Seaboard employees to make a notation on the Pick Up Order and Tally Sheet; (iii) that such a notation would not have constituted the complaint required by Article 26(2) and (3); and (iv) that Eastman had ample time to file a proper claim after delivery of the four cartons to Rochester. In granting summary judgment to Seaboard with respect to this contention, the judge relied on a rather ungenerous characterization of Kochersberger's reply affidavit and on the fact that Eastman "was, or should have been, aware of the shortage from the time that Kochersberger delivered the shipment" to its Rochester plant. 575 F.Supp. at 1144. We shall deal with Seaboard's arguments seriatim.
 
 
 55
 (i) Authority with respect to the meaning of "fraud" in Article 26(4) is sparse. Taken in context the term cannot be confined to the common law tort of fraudulent misrepresentation classically described in Sec. 525 of the Restatement (Second) of Torts (1977).[22] It would include at least the conduct described in Sec. 550, "Liability for Fraudulent Concealment" and Sec. 551, "Liability for Nondisclosure". Indeed defendants concede there would be "fraud" if a carrier concealed the damage from the consignee so that no complaint could be made within the prescribed period. See McNair, The Law of the Air 188 (M. Kerr & A. Evans 3d ed. 1964); G. Miller, Liability in International Air Transport 173 (1973). We would go further and read the fraud exception as including any intentional acts by the carrier or its agents which significantly decrease the likelihood of the shipper's giving notice during the brief period allowed. As one commentator has observed, "The fraud mentioned in [Article 26(4) ] is not of a restrictive nature." N. Matte, Treatise on Air-Aeronautical Law 425 (1981).[23] Hence if a preponderance of the evidence were to show that a carrier discouraged a consignee's truckman from making an appropriate entry on a copy of the air waybill retained by the carrier or informed him that written notice was unnecessary because the carrier knew of the damage, the fraud exception would be made out.
 
 
 56
 (ii) Seaboard's second argument rests on an unduly literal reading of Kochersberger's affidavits, despite the rule that when summary judgment is to be granted, the benefit of the doubt must be given to the opposing party. See, e.g., Adickes v. S.H. Kress & Co., supra, 398 U.S. at 157, 90 S.Ct. at 1608; American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2 Cir.1981). The crucial statements are: that a Seaboard supervisor whom Kochersberger had sought out in order to complain about the thirty-six missing cartons presented him with the Pick Up Order and Tally Form and requested him to sign it despite its statement, known to Seaboard to have become false, that the container had the full weight specified in the air waybill; that, before signing, Kochersberger said he wanted to have written on the form that thirty-six cartons were missing; that the supervisor "stated that he could not put the notation of missing cargo on the Pick Up Order and Tally Form, giving me the impression that it was not a proper procedure to do so" (emphasis supplied); and that, as a recently employed driver, he did "not have any reason to suspect that the supervisor was not telling me the truth that a notation of missing cargo could not be placed on the Pick Up Order and Tally Form." Reading this in the light most favorable to plaintiff, as we must, this sufficiently alleged that what the supervisor conveyed to Kochersberger was not simply that the supervisor could not properly make the notation but that Kochersberger also could not. This would be "fraud" if the allegations were sustained and other elements of the fraud exception were made out.
 
 
 57
 (iii) Article 26(3) requires that the complaint "must be made in writing upon the document of transportation or by separate notice in writing." Although the district court appears to have thought the Pick Up Order and Tally Form was a "document of transportation", 575 F.Supp. at 1144, plaintiff seemingly concedes that it was not, Brief for Appellant at 33, a concession we consider to be correct.[24] He contends, however, that if the required complaint had been entered on the Pick Up Order and Tally Form, this would constitute "separate notice in writing"--a contention which also seems to us to be correct.[25] Seaboard answers that even if all this be so, Kochersberger would have done no more with the Pick Up Order and Tally Form than he did with his company's Receipt and the Customs Service Transportation Entry and Manifest, namely, to note that only four rather than forty cartons had been delivered. To show that this would not have sufficed, Seaboard relies on cases that have arisen under railroad bills of lading. These are rather inconclusive.[26] The leading Supreme Court case, Georgia, Florida & Alabama Ry. v. Blish Milling Co., 241 U.S. 190, 198, 36 S.Ct. 541, 545, 60 L.Ed. 948 (1916) (Hughes, J.), stresses that the object of such a clause is "to secure reasonable notice", that compliance "does not require documents in a particular form", and that the clause should "be construed in a practical way." Other cases have emphasized the need to give sufficient notice to enable the carrier to investigate and an intention to claim reimbursement. See, e.g., American Synthetic Rubber Corp. v. Louisville & Nashville R.R., 422 F.2d 462, 468 (6 Cir.1970); Wisconsin Packing Co. v. Indiana Refrigerator Lines, Inc., 618 F.2d 441, 444-47 (7 Cir.) (en banc), cert. denied, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980). See also Lady Marlene Brassiere Corp. v. Irish International Airlines, 13 Av.Cas. (CCH) 17,428 (N.Y.Civ.Ct.1971). We should suppose that a notice that nine-tenths of a designated shipment made by an air waybill were missing, which Kochersberger swore he wished to place on the Pick Up Order and Tally Form, would be sufficient to put a carrier on notice to investigate and, at least, when the shipment was as valuable as that here, also to give notice that a claim would be made.[27] We think it best to defer ruling on this, however, until Kochersberger has testified exactly what he would have placed on the Pick Up Order and Tally Form if Seaboard's supervisor had not dissuaded him from doing so, and also until we have had the benefit of evidence, briefing or both, on whether the French word "protestation" has the same meaning as the English word "complaint".[28]
 
 
 58
 (iv) We likewise do not regard Seaboard's final point as being so completely dispositive in favor of defendants as did the district judge, 575 F.Supp. at 1144. There is no general rule excusing the perpetration of a fraud because the victim could have rescued himself from it and Article 26(4) surely does not dictate one. Much may depend on exactly what Seaboard's employees told Kochersberger at Kennedy Airport and what he told Eastman on delivering the goods at Rochester. We should not attempt to prescribe the law until we know the facts.
 
 
 59
 (3) The provisions of the air waybill and of the tariff
 
 
 60
 The district judge seemingly did not pass on a third objection by plaintiff to the grant of summary judgment to the defendants.[29]
 
 
 61
 Paragraph 10 of the Conditions of Contract on the reverse side of the air waybill reads as follows:
 
 
 62
 (a) No action shall be maintained in the case of damage to goods unless a written notice, sufficiently describing the goods concerned, the approximate date of the damage, and the details of the claim, is presented to an office of Carrier within 7 days from the date of receipt thereof, in the case of delay unless presented within 14 days from the date the goods are placed at the disposal of the person entitled to delivery, and in the case of loss (including non-delivery) unless presented within 120 days from the date of issue of the air waybill.
 
 
 63
 (b) Any rights to damages against Carrier shall be extinguished unless an action is brought within two years after the occurrence of the events giving rise to the claim.
 
 
 64
 The major difference between paragraph 10(a) of the air waybill and Article 26(2) of the Convention is that the former makes specific provision with respect to loss of goods whereas the latter does not. It has been held that, in a case of total loss, where Article 26(2) imposes no time limit, a provision like paragraph 10(a) is valid despite Article 23 of the Convention which declares that "[a]ny provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this convention shall be null and void."[30] If "damage" in Article 26(2) includes a case like this, and thus requires notice within seven days of receipt, a proposition on which Seaboard's position depends, the longer time period afforded by paragraph 10(a) could not possibly offend Article 23. There is no reason to read "loss" in such an air waybill as meaning only total loss; rather it does much less violence to the language to say that "loss" means all kinds of loss and that damage means only physical damage. See Famolare, Inc. v. Seaboard World Airlines, 15 Av.Cas. (CCH) 17,287 (N.Y.Sup.Ct.1978) (120 day period applies to loss of fifty-three out of 1696 shipped cartons); Schwimmer v. Air France, 87 Misc.2d 147, 384 N.Y.S.2d 658 (Civ.Ct. Bronx 1976) (120 day period applies to loss of seven out of eleven cases). If this is less favorable to the carrier than the Convention as construed in Fothergill, the carrier has made its own bed.
 
 
 65
 While Seaboard contests the last point, its principal answer lies in its tariff provisions. The tariffs filed with the Civil Aeronautics Board, pursuant to 49 U.S.C. Sec. 1373, for all international carriers which were in effect in July, 1980 included Rule 23(B) (Time Limitations on Claims and Actions), which provided, in pertinent part, as follows:
 
 
 66
 No action shall be maintained in the case of damage to or partial loss of cargo unless a written notice, sufficiently describing the cargo concerned, the approximate date of the damage, and the details of the claim is presented to an office of Carrier within 7 days from the date of receipt thereof, in the case of delay unless presented within 14 days from the date the cargo is placed at the disposal of the person entitled to delivery of the consignment, and in the case of loss (including non-delivery) unless presented within 120 days from the date of issue of the air waybill.
 
 
 67
 The tariff thus makes clear, as the air waybill does not, that the 120 day limit applies only to cases where the seven day limit of Article 26(2) as construed in Fothergill does not. If this were the whole story, any argument of plaintiff on the basis of paragraph 10 of the air waybill would indeed be foreclosed, since it is common ground that in the event of conflict between the air waybill and the tariff, the latter prevails. See, e.g., Northwest Airlines, Inc. v. United States, 195 Ct.Cl. 356, 444 F.2d 1097, 1100-01 (1971); Rosch v. United Air Lines, Inc., 146 F.Supp. 266, 267 (S.D.N.Y.1956); see also Davis v. Cornwell, 264 U.S. 560, 562, 44 S.Ct. 410, 410-11, 68 L.Ed. 848 (1924) (Brandeis, J.). However, the page of the tariff containing Rule 23(B) stated at its foot "Not applicable to SB", the latter initials being defined in the tariff as referring to Seaboard. Defendants seek to answer this by saying that the quoted statement was a clerical printing error made by the organization which filed the tariff on behalf of all international carriers and was later corrected without request from Seaboard. More particularly, Seaboard claims that the language at the foot of the page is preceded by an asterisk but that none of the tariff provisions on the page bears one, whereas in prior and subsequent revisions of the same page the "Not applicable to Seaboard" language was prefixed by a reference mark to Rule 24 (Overriding Law), and Rule 25 (Modification and Waiver), but not to Rule 23. While we by no means dismiss this claim, plaintiff had presented enough that his position with respect to inapplicability of the tariff should not have been rejected by the grant of summary judgment. On this issue also, namely, the meaning and effect of Seaboard's tariff effective at the date of the shipment, there should be a trial, with Seaboard producing its officers who submitted affidavits, and with both sides free to call tariff specialists, the appropriate officer of the organization that filed the tariff,[31] and any other witnesses able to give relevant testimony, and with the court bearing in mind the rule that ordinarily mistakes in the formulation of a tariff do not justify departure from the tariff as filed and that ambiguities are to be construed against the carrier. See, e.g., Continental Can Co. v. United States, 272 F.2d 312, 315 (2 Cir.1959); United States v. Pan American Mail Line, Inc., 359 F.Supp. 728, 735 & n. 6 (S.D.N.Y.1972).
 
 
 68
 The order granting defendant's motion for summary judgment is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 More formally, a Convention for the Unification of Certain Rules Relating to International Transportation by Air. The Convention was adopted at a conference held in Warsaw in 1929 and was adhered to by the United States in 1934. See 78 Cong.Rec. 11582; 49 Stat. 3013. The text of the Convention can be found at 49 Stat. 3000-3026; at T.S. No. 876, 137 L.N.T.S. 11; and at 49 U.S.C. Sec. 1502 note. Applicability of the Convention is conceded
 
 
 [2]
 Seaboard has since been merged into Flying Tiger Line, Inc., also named as a defendant
 
 
 [3]
 All the events herein described took place in 1980
 
 
 [4]
 Article 26(2) of the Warsaw Convention provided a three day period for giving notice of damage to baggage. The Hague Protocol of 1955, which was ratified by Great Britian, see Carriage by Air Act, 1961, 9 & 10 Eliz. 2, ch. 27, Sec. 1(1) & sched. 1, but not by the United States, altered this to seven days, the same period which the Warsaw Convention had fixed for damage to goods. See The Hague Protocol of 1955 art. XV, reprinted in 2 International Conference on Private Air Law, The Hague, September 1955, Documents 8 (ICAO Doc. 7686-LC/140 (1956)
 
 
 [5]
 Our agreement that high regard was proper is based not only on the respect always due to a decision of the House of Lords but also to the quality of the speeches of the law lords who participated in the Fothergill decision, and the special expertise in aviation law of Lord Wilberforce who delivered the first and most comprehensive speech. Mr. Wilberforce, as he then was, had been a member of the British delegation to the International Conference on Private Air Law at the Hague, in September, 1955, see ICAO Doc. 7686-LC/140, Vol. II, at 25, which adopted a Protocol signed but not ratified by the United States, amending the Warsaw Convention in important respects; he was later the chief British delegate to the Guadalajara Conference in 1961, see ICAO Doc. 8301-LC/149-1, Vol. II, at 13. Moreover, when a case concerns the interpretation of a treaty, the desirability of international uniformity suggests the wisdom of following a thoroughly considered decision of the highest court of an important signatory, particularly one which has attracted acceptance elsewhere, if the scales are fairly balanced. See Block v. Compagnie Nationale Air France, 386 F.2d 323, 336-38 (5 Cir.1967) (Wisdom, J.), cert. denied, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); Day v. Trans World Airlines, Inc., 528 F.2d 31, 35-36 (2 Cir.1975), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); Saks v. Air France, 724 F.2d 1383, 1385 (9 Cir.1984); Restatement of the Foreign Relations Law of the United States (Revised) Sec. 329(3)(b) & comment c (Tent. Draft No. 1, 1980)
 
 
 [6]
 The holding on this was unanimous, although there were some differences with respect to the reasoning; Lord Fraser is recorded as having dissented with respect to reliance on the minutes of the Hague Conference--a point discussed below. All members rejected the contention that the Property Irregularity Report was sufficient notice of the loss of the contents
 Lord Wilberforce noted, p. 298, that the problems presented on Mr. Fothergill's appeal had been disposed of for the future by the Carriage by Air and Road Act, 1979, ch. 28, Sec. 2. This added to the Carriage by Air Act, 1961, 9 & 10 Eliz. 2, ch. 27, a new section 4A entitled "Notice of partial loss", paragraph (1) of which provided:
 In Article 26(2) the references to damage shall be construed as including loss of part of the baggage or cargo in question and the reference to the receipt of baggage or cargo shall, in relation to loss of part of it, be construed as receipt of the remainder of it.
 The statute declared that it should not apply to loss which occurred before its passage. Presumably for this reason Lord Wilberforce stated, p. 298, "(It clearly, in my opinion, cannot be used as an aid to interpretation of the pre-existing Convention.)" An American court might not have closed the door so swiftly. See, e.g., Rohauer v. Killiam Shows, Inc., 551 F.2d 484 (2 Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); In re Texlon Corp., 596 F.2d 1092, 1098 (2 Cir.1979); Sam Wong & Son, Inc. v. New York Mercantile Exch., 735 F.2d 653, 676 n. 30 (2 Cir.1984).
 
 
 [7]
 He thought the purpose to be as follows, p. 299:
 (1) to enable the airline to check the nature of the "damage";
 (2) to enable it to make enquiries how and when it occurred;
 (3) to enable it to assess its possible liability, to make provision in its accounts and if necessary to claim on its insurers;
 (4) to enable it to ensure that relevant documents (e.g. the baggage checks or passenger ticket, or the air waybill) are retained until the issue of liability is disposed of.
 
 
 [8]
 Such references necessarily imply that, despite the failure of the United States to ratify The Hague Protocol, an American court may look to The Hague minutes as showing what representatives of the attending countries considered the Warsaw Convention to mean. A domestic analogy would be resort to Congressional debate over an unenacted bill. Our courts assign some but not very much weight to this. See, e.g., Kosak v. United States, --- U.S. ----, 104 S.Ct. 1519, 1524-28, 79 L.Ed.2d 860 (1984); id. at 1530 n. 5 (Stevens, J., dissenting); Reston v. FCC, 492 F.Supp. 697, 703-05 (D.D.C.1980)
 
 
 [9]
 The writer of this opinion, who attended The Hague conference as an adviser to the United States delegation but has no recollection of this particular interchange, would agree with the remarks of Lord Diplock, p. 305:
 With some personal experience of international conferences of this kind, I should not attach any great significance to the fact that two delegates in withdrawing an amendment to art. 26 which would have included in the article an express reference to partial loss as well as to damage, said, without contradiction by any other delegates who happened to be present at that time, that they did so on the understanding that partial loss was included in the expression damage. Macchiavellism is not extinct at international conferences.
 
 
 [10]
 Malcolm McLean, the president of an American trucking firm, McLean Trucking Co., pioneered the use of containers in the domestic ocean shipping trade during the late 1950's through a subsidiary, Sea Land Service, Inc. In 1966 Sea Land successfully introduced containerization into the international shipping trade on the North Atlantic routes. During the 1960's the transportation of containerized cargo grew rapidly. See Mankabady, Some Legal Aspects of the Carriage of Goods by Container, 23 Int'l & Comp. L.Q. 317, 317 n. 2 (1974); Tombari, Trends in Oceanborne Containerization and its Implications for the U.S. Liner Industry, 10 J.Mar.L. & Comm. 311, 313 (1979)
 With respect to air freight, the first standard-size containers for use in jet freighters were introduced in late 1963. The Civil Aeronautics Board approved a domestic air freight container program in 1966; at about the same time the International Air Transport Association launched a program of registering containers of various sizes for common use in international air commerce. See Philion, Containerization is giving air freight a big lift, ICAO Bull. 16, 16 (Oct.1973).
 
 
 [11]
 Discussions among the delegates considering the Warsaw Convention in 1929 confirm the district court's statement that "the Convention makes no distinction between obvious and hidden damage." 575 F.Supp. at 1143. See Minutes, Second International Conference on Private Aeronautical Law, October 4-12, 1929, Warsaw 214-18 (R. Horner & D. Legrez trans. 1975) (Conference rejects proposed amendment which would have specified that seven day notice provision applies to cases of "non-apparent damage" on ground that "damage" obviously encompasses both apparent and non-apparent damage); id. at 106 (statement of Henri De Vos, Reporter to the Convention) ("The second paragraph [of Article 26 (Article 27 in draft form) ] covers all claims [apparent and non-apparent damage]."). See also D. Goedhuis, National Airlegislations and the Warsaw Convention 281 (1937)
 
 
 [12]
 One would suppose that in such event the truckman would have been alerted by the difference in weight. The air waybill states the gross weight as 4785 kilograms; the weight of the container appears to have been approximately 326 kilograms, see Jt.App. at 939
 
 
 [13]
 We recognize this hypothetical is somewhat unlikely. Presumably when a suitcase was damaged as badly as Mr. Fothergill's, at least a casual look at the contents would immediately be taken
 
 
 [14]
 This was recognized by the district court, 575 F.Supp. at 1141 (albeit somewhat grudgingly, "may need no written notice"). The Supreme Court of the Netherlands has seemingly held the contrary in Affretair v. VOB, Judgment of Feb. 12, 1982, R.W. 1982,50, reprinted in Note, Supreme Court of the Netherlands: Affretair v. VOB or Fothergill's Dutch Treatment, 7 Air L. 173, 175 (1982), except in a case where "the consignee has been given reason to believe that the actual delivery of the goods as actually effected was not intended by the carrier as being in full satisfaction of his obligation to deliver."
 
 
 [15]
 This is somewhat more than the net weight in kilograms stated in the air waybill, 4458.5 kilograms
 
 
 [16]
 Plaintiff submitted affidavits of Leonard S. Leaman, Esq., one of its attorneys, and Edward Kochersberger, the Rochester Air Freight truck driver. Most of the factual allegations in Mr. Leaman's affidavit simply parapharase Kochersberger's; we turn directly to the latter
 
 
 [17]
 The container was delivered to me by three employees of Seaboard World Airlines on July 18, 1980, at which time I noticed the doors were open and the seal on the doors of the container was broken--a fact which was obvious to anyone who looked at the containers
 After inspecting the contents of the container, I informed the three employees of Seaboard World Airlines who had delivered the container to me (one of whom I knew by the name of Joe Martinez, who I understood was one of Seaboard's lead ramp men) that there were only four pieces remaining in the container, and that 36 pieces were missing. The four pieces remaining consisted of four boxes on four separate pallets; and I made a notation on the delivery receipt which states that of the shipment which had consisted of 40 pieces, only four pieces remained when I inspected the container, and I put the word four on the delivery receipt which I signed. A xerox copy of this delivery receipt which I signed is annexed hereto.
 A United States Customs representative was also in attendance when the container was delivered to me at John F. Kennedy Airport by the three employees of Seaboard World Airlines, and he noted in preparing his form 7512 that only four pieces of cargo remained in the container upon delivery.
 Thereafter, the container delivered to me by the three employees of Seaboard was unloaded by them and the four pieces of cargo which remained in the container were loaded on my trailer truck. I then drove the trailer truck so loaded to the Holiday Inn at John F. Kennedy Airport, at which time another driver who was also employed by Rochester Air Freight took the trailer truck and made the delivery of the four pieces to Eastman Kodak Company at Kodak Park, Rochester, New York on July 21, 1980.
 
 
 [18]
 I should like to state the facts and circumstances under which I signed the Pick Up Order and Tally Form by which Mr. Iacovelli stated I acknowledged "receipt of the shipment in good order and condition."
 When the container was delivered to me at JFK on July 18, 1980 by the three ramp men who were employees of Seaboard and after I stated to the three ramp men employed by Seaboard that 36 of 40 pieces shipped in the container were missing, I sought out a supervisor of Seaboard (a man whose name I do not presently recall, but he was a rather short and stocky individual) who acknowledged that he was a supervisor of Seaboard and in fact gave me his name but I do not recall it. It was this man who presented me with the Pick Up Order and Tally Form for signature. I reviewed the form and he requested me to sign it but I stated to him that I wanted to have written on the form the fact that 36 pieces of cargo were missing from the container.
 Although this individual who stated he was a supervisor acknowledged that the cargo was missing, he stated that he could not put the notation of missing cargo on the Pick Up Order and Tally Form, giving me the impression that it was not a proper procedure to do so. I was only recently employed as a truck driver at the time of this pick up on July 18, 1980 and did not have any reason to suspect that this supervisor was not telling me the truth that a notation of missing cargo could not be placed on the Pick Up Order and Tally Form. I, therefore, under these circumstances signed the Pick Up Order and Tally Form which was presented to me.
 I would also like to state that on several occasions prior to July 18, 1980 when I was instructed to pick up the containers which Kodak Limited had consigned to Eastman Kodak, I had picked up the contents of similar size containers of Seaboard for trans-shipment. Some of these containers had been sealed and others were unsealed but in many cases both sealed and unsealed containers were opened by Seaboard prior to my putting in an appearance to pick up the contents of these containers for trans-shipment by truck.
 
 
 [19]
 One of the three Seaboard employees mentioned in Kochersberger's first affidavit was later convicted as a participant in the theft of the 36 missing pieces
 
 
 [20]
 This inference derives some support from what actually happened, from the last paragraph of Kochersberger's reply affidavit, see supra note 18, and from the absence of any response by Seaboard
 Under Article 18(1) of the Convention, Seaboard is liable for "damage sustained in the event of the destruction or loss of, or of damage to ... any goods, if the occurrence which caused the damage so sustained took place during the transportation by air." Under Article 18(2) "transportation by air ... shall comprise the period during which the ... goods are in charge of the carrier, whether in an airport or on board an aircraft." See, e.g., Manufacturers Hanover Trust Co. v. Alitalia Airlines, 429 F.Supp. 964 (S.D.N.Y.), aff'd mem., 573 F.2d 1292 (2 Cir.1977).
 
 
 [21]
 We say this despite what appears to be the holding favorable to the carrier by the Supreme Court of the Netherlands in Affretair, supra note 14. See also R. Mankiewicz, The Liability Regime of the International Air Carrier Sec. 212.1, at 180-81 (1981) (distinguishing between "[p]artial destruction of loss, stricto sensu," i.e., where "one or several items shipped under one single air waybill have been lost or destroyed", which requires no written complaint under Article 26, and "destruction or loss of some or all of the contents of a single package or piece of baggage [which] must be considered as damage to the cargo or baggage and thus requires the filing of a written complaint within the time limit prescribed in Article 26(2)"). This leaves the question "What is the package?"--an issue with which we have had all too much experience with respect to containers in another branch of transportation, see, e.g., Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807 (2 Cir.1981)
 
 
 [22]
 This is:
 One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.
 
 
 [23]
 This broader view is supported by a statement of the Higher Regional Court of Frankfurt am Main in a decision dated June 3, 1976 (16 U 9 2/75), in which the court stated: "Fraudulent action would be present only if the air cargo carrier would have prevented the consignee in some manner from submitting the report within the prescribed term." It draws further support from the controlling French text. See R. Mankiewicz, supra, Sec. 215, at 185:
 Article L. 321-4, paragraph 2, of the French Code of Civil Aviation gives an authentic interpretation of the word fraude, namely, an "act by which the carrier conceals or tries to conceal the damage, loss or delay, or by any other means which prevents or tries to prevent the consignee from filing a complaint within the prescribed time limits".
 
 
 [24]
 Chapter II of the Convention is entitled "Transportation Documents;" it speaks only of the passenger ticket, the baggage check and the air waybill. See R. Mankiewicz, supra, Sec. 69, at 55 (Convention "provides for three documents of carriage"). Article 6(2) requires that one part of the air waybill shall be marked "for the consignee" and shall accompany the goods. The record is silent as to what happened to this copy
 
 
 [25]
 While it could be argued against this that such a notation would not attain the objective of giving notice to the carrier's employees who were not engaged in the shipment and delivery process, the argument is flawed. The same could be said in regard to a notation on the air waybill, which would clearly be sufficient under the Convention if properly phrased. Nothing in the Convention prescribes what officials of the carrier must be notified
 
 
 [26]
 Judge Bondy's opinion in Delaware, L. & W.R.R. v. United States, 123 F.Supp. 579 (S.D.N.Y.1954), contains a good review of the cases up to that date
 
 
 [27]
 In Judge Bondy's language, 123 F.Supp. at 582, the carrier "could not have inferred that the letter [here the hypothetical notation] was written for any purpose other than to give notice that a claim would be made." See R. Mankiewicz, supra, Sec. 211, at 179 ("The Convention does not prescribe a specific wording for the written complaint; it is sufficient that the complaint indicate in unequivocal terms the damage for which the carrier is held responsible ...."). Both paragraph 10(a) of the air waybill's Conditions of Contract and Rule 23(B) of the tariff discussed below speak of a written notice, sufficiently describing the goods concerned, the approximate date of the damage and the details of the claim. Plaintiff has not argued that the notation on the Rochester Air Freight receipt was sufficient notice
 
 
 [28]
 A well-thumbed dictionary in existence at the date of the Convention gives, not very illuminatingly, as one meaning, "Declaration en forme, par laquelle on s'eleve contre une chose". Petit Larousse Illustre (1923)
 
 
 [29]
 His closest approach to this is a statement, 575 F.Supp. at 1138, "For reasons not relevant, the Seaboard Tariff has no bearing in this case." Plaintiff's argument is based on the air waybill, not on the tariff; plaintiff would agree that the tariff has no bearing, for reasons later discussed, but Seaboard does not
 
 
 [30]
 Butler's Shoe Corp. v. Pan American World Airways, Inc., 514 F.2d 1283, 1285 (5 Cir.1975). See also Famolare, Inc. v. Seaboard World Airlines, 15 Av.Cas. (CCH) 17,287 (N.Y.Sup.Ct.1978) (120 day period applies to loss of 53 out of 1696 shipped cartons); Schwimmer v. Air France, 87 Misc.2d 147, 384 N.Y.S.2d 658 (Civ.Ct.Bronx 1976) (120 day period applies to loss of seven out of 11 cases). But see R. Mankiewicz, supra, Sec. 214, at 215 (citing contrary decisions of French, German and Belgian courts). Cf. Molitch v. Irish Int'l Airlines, 436 F.2d 42, 43-44 (2 Cir.1970)
 
 
 [31]
 Seaboard did submit a post-argument letter with attachments, from Walter A. Mott, Manager--Cargo Tariffs, of the Official Airlines Guides firm, on the subject, but this was not in the form of an affidavit as required by Fed.R.Civ.P. 56(e)